NUMBER 13-99-789-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

_____________________________________________________________________


SOUTHWESTERN BELL TELEPHONE COMPANY , Appellant,

v.



DAVID GARZA , Appellee.

_____________________________________________________________________


On appeal from the 357th District Court

of Cameron County, Texas.

____________________________________________________________________


O P I N I O N

Before Justices Dorsey, Castillo, and Cantu (1)

Opinion by Justice Cantu



This is an appeal by Southwestern Bell Telephone Company from a jury verdict favoring former employee, David Garza, in
his suit for discrimination and termination in violation of the Texas Anti-Retaliation Statute. (2) Based on the evidence, the
jury concluded that the discrimination or termination was committed with malice and awarded $1,034,108.00 as
compensatory damages and $1,000,000.00 as punitive damages. For reasons hereinafter stated, we will affirm.

SOUTHWESTERN BELL'S CONTENTIONS

 In ten issues, which we regroup into eight basic challenges, Southwestern Bell makes the following claims: (1) that the
evidence was neither legally nor factually sufficient to sustain the jury's finding that Garza was "disqualified or discharged"
in violation of the anti-retaliation statute, (2) that the court should not have submitted a question inquiring whether it
"discharged" Garza because his petition sought damages only for "disqualification" under the statute, (3) that the liability
question was improperly submitted in the disjunctive requiring an answer that cannot support the judgment entered, (4) that
the trial court erred in admitting and excluding certain evidence, (5) that the mental anguish award is not supported by
legally nor factually sufficient evidence, (6) that the trial court erred in refusing to instruct the jury pursuant to its tendered
definition of mental anguish, (7) that the findings of malice and punitive damages are not supported by legally and
factually sufficient evidence, and (8) that the trial court erred in denying its request for remittitur of mental anguish and
punitive damages.

FACTUAL SUMMARY

David Garza, a twenty year employee with Southwestern Bell in Brownsville, Texas, sustained a work related injury to his
head and neck on October 20, 1994, a Thursday, while working as an outside plant technician when his co-worker, Louis
Hernandez, lowered a hydraulic crane-bucket directly above Garza's head as Garza worked on the ground slicing a wire
strand. After Garza struck his head, angry words were understandably exchanged with Hernandez. Hernandez then
reported the confrontation to their "second line" supervisor Ruben Gonzalez. (3) Garza did not report the injury at that time;
nevertheless, Gonzalez immediately initiated an investigation into the incident. (4) After interviewing both Garza and
Hernandez, Gonzalez concluded that it was impossible to determine exactly what happened. The initial investigation did
not, however, establish any safety violations by Garza, although it did find that both employees had committed unsafe acts.
Gonzalez recommended that both, Garza and Hernandez, be given an oral reprimand, termed "a step of positive discipline"
for "effectiveness with others" for not getting along with one another. Garza continued to work on the assigned project
with another co-worker through the weekend on overtime status.

Sometime during the weekend, Garza began to experience neck pain. The following Monday, October 24, 1994, he
reported the injury to Rene Robles, his "first line" supervisor and requested medical treatment. Robles took Garza to a
doctor, thereby causing a workers' compensation claim to be initiated. Robles then drafted a "Flash Report" of the injury
for Wayne Rider, a "third line" supervisor and Regional Manager representing upper-level management. The Flash Report
indicated that no further investigation was warranted. The incident did not become a serious issue of concern to
Southwestern Bell management until Garza sought medical treatment. The seeking of medical attention triggered a safety
investigation under the rules of Southwestern Bell and the Occupational Safety and Health Administration. Thereafter,
Garza's safety habits and career safety record became the focus of Garza's supervisors. Rider changed the "Flash Report"
and ordered another investigation of the incident to be conducted, indicating, in his memorandum, that an assessment of
punishment was a foregone conclusion upon completion of the investigation. (5)

The investigating committee looking into the circumstances of the accident concluded that it was not able to determine the
cause of Garza's injury because of conflicting versions and lack of witnesses. As a result, no action was recommended
against Hernandez, the co-worker who had lowered the hydraulic crane bucket onto Garza's head. (6) Rider, nevertheless,
requested that Gonzalez review Garza's entire personnel file spanning twenty years, which included a number of remote
minor incidents, some of which were not Garza's fault and some which referred to driving errors and warnings with respect
to further safety incidents. 

Gonzalez noted every accident or mishap in Garza's file, regardless of any fault attributable to Garza, and drafted a report
criticizing his safety record. The report listed ten "accidents" involving Garza and five unsatisfactory safety ratings over
the previous twenty years. It also criticized Garza's attitude. Gonzalez concluded his report by recommending that Garza
be "disqualified" from his outside plant technician position with loss of his driving privileges, which necessarily
disqualified him from all positions requiring driving and most of the jobs he had performed during his twenty years with
Southwestern Bell. (7) Essentially, Gonzalez reversed his previous decision to issue a verbal reprimand and complied with
Rider's instructions to take disciplinary action upon completing his investigation. 

Although Garza's injury occurred while the crane bucket was being operated by Hernandez, neither Robles, Gonzalez, nor
Rider considered it appropriate to examine Hernandez's personnel file or to evaluate his safety record, even though the
investigating committee attributed most of the fault to Hernandez. Gonzalez testified that Hernandez was not disciplined
after the accident, as was Garza, because he (Gonzalez) had, in the meantime, been transferred to the engineering
department and no longer exercised disciplinary jurisdiction over Hernandez. Gonzalez admitted that he, nonetheless,
continued disciplining Garza because Rider wanted him to act on Garza's matter right away. Moreover, Gonzalez neither
prepared an accident report for Hernandez's file nor even bothered to look into his file. 

When confronted with Hernandez's file, Gonzalez was unable to explain why a number of accidents in which Hernandez
had been found at fault, and of which he was personally aware, were never entered into Hernandez's file as required by
company policy. A review of Hernandez's safety record before the jury disclosed a safety record perhaps more serious than
Garza's. (8) Rider immediately approved the recommendation. Two days later, on November 8, 1994, Garza was told to
find a non-driving position in the company within two months, or he was to be terminated. 

 As a union member, (9) Garza requested and received a grievance hearing prior to his termination. Dennis Dobbs, president
of the communication workers, local 6209, and an employee of Southwestern Bell, attended the meeting and took notes.
Relying on his notes, Dobbs testified that Gonzalez stated that the incident involving Garza and Hernandez would have
been insignificant except that Garza's election to seek medical treatment made it a chargeable accident against Garza and a
"reportable accident" involving workers' compensation and OSHA. Dobb's notes further reflected remarks by Rider that
Garza was probably the best lineman in the Brownsville area, and possibly the best lineman in his (Rider's) organization.

As president of the local union, Dobbs attended many grievances as representative. During his six years in that position,
Dobbs never saw an employee disqualified from driving as a result of a review of a non-driving incident or as a result of an
incident that occurred that was non-driving related. Finally, Dobbs recalled Rider making a statement to him that "if Garza
had not gone to see a doctor, nothing would have happened." According to Dobbs, Southwestern Bell did not adhere to its
own driving policies when it removed Garza's driving privileges. 

Pursuant to Southwestern Bell's "Driving Record Review Policy," the company may remove an employee from a driving
job if the determination is based upon an investigation following a report from the public, another employee, or any law
enforcement offense stating that the driver engaged in unsafe driving behavior as defined  or an inappropriate
circumstance based upon direct and incidental supervisory observation of such unsafe driving behavior. 

After reviewing Garza's driving record and the company policy, Dobbs expressed the opinion that none of the criteria
required for removal of Garza's driving privileges existed. This opinion was never challenged.

Dobbs's testimony was further corroborated by that of Diana Vasquez, former vice president of the local union and now a
member of Southwestern Bell management, who also attended the grievance hearing. Vasquez, relying on union notes
prepared by her at the hearing, testified that she was "shocked" and "surprised" when Garza was told by Southwestern Bell
management, in her presence, that "he was the best employee they ever had," and that "if he hadn't gone to the doctor he
wouldn't be sitting there with him being in this position of getting a non-driving job." Vasquez described how the October
20, 1994 incident had evolved from a personality clash between Garza and Hernandez to a "safety" problem after Garza
caused the worker's compensation claim to be filed. 

According to Vasquez, Garza was senior to Hernandez and should have had preference for remaining jobs in surplus
situations. Because a determination had been made that Garza and Hernandez were not to work together again, Garza as
senior to Hernandez should have been given the choice of remaining in Brownsville or moving to Harlingen. Instead,
Hernandez was given the choice of going to Harlingen or remaining in Brownsville. Hernandez declined to move to
Harlingen. Garza also declined to move to Harlingen. At the time of trial, Hernandez was still an employee of
Southwestern Bell having followed his job to Harlingen. 

In the meantime, on October 31, 1994, Southwestern Bell declared a "surplus" of various non-management positions and
initiated a reduction in force, deleting jobs in Brownsville. The affected employees were afforded an opportunity to relocate
to a similar position, to test for other positions, to accept a downgrade, or to accept separation from employment with
severance payment and with right of recall or rehire. Garza took several "technical knowledge tests" in an attempt to
qualify for alternative non-driving positions but was not successful in passing them. The "surplus" required Garza and his
co-workers to compete for jobs in Harlingen and McAllen. Because Garza's driving privileges had been removed, his
chances of surviving the reduction in force were severely handicapped, despite his seniority over other co-workers,
including Hernandez.

Removal from his position as outside plant technician prevented him from following his job to Harlingen, McAllen and
other places in the Rio Grande Valley. Garza was given an ultimatum of relocating to San Antonio at a different position
and for less pay or have his employment terminated. Because he was unwilling to uproot his family, cause his wife to lose
her job, and leave his aged father, Garza was terminated on January 3, 1995.

Southwestern Bell insisted that this "force disposition date" was not in any way related to the investigation resulting from
the October 20, 1994 incident and that the disqualification was a result of its review of Garza's overall safety record.
However, Gonzalez admitted under vigorous examination that the reason Garza was disqualified was because of the
October 20,1994 incident.

* * * * *

 

 

 


 You have no reason to believe that he wouldn't be with the company still if he hadn't been disqualified from driving on
that event?


 

 

 


 We disqualified him based on this incident, yes, sir.



Upon examination, Rider was questioned about the disqualification of Garza:

Q. . . . Before you received the recommendation and after this committee report, did you make a final decision about what
you were going to do about David Garza and his ability to continue to drive and work outside?

 

 

 


 The decision, if you are asking whether the decision was made, it was made on basically the 20th, the day of the
Thursday and the Friday of the accident, of the incident.

 


 

 


 So what you are telling us, you decided to terminate David Garza or disqualify him from outside employment and
driving all the way back on Thursday?



 

 

 


 We had - Ruben Gonzalez called me and was - discussed the incident that happened and said that he is very fed up with
all these things that were happening with David Garza.
 


 

 


 He didn't mention Louie Hernandez?


 

 

 


 No, sir. He just said he talked about the incident with David. He said that he had had a long term problem with David,
his safety, all the other problems that he had had and he said he's fed up with it. And he was recommending that we
disqualify David from working in an outside job at that particular time.


 

 

 


 All right. So everything that happened after that was just window dressing?


 

 

 


 If you would like to put it in that context, I would say, yes, sir.


* * * * *

Rider insisted that he did not rely on Garza's driving record but on his entire safety record. Rene Robles admitted that he
had not reviewed Garza's personnel file since 1992, nor had he investigated how the accident had occurred before
recommending a non-driving job. In fact, Robles admitted that he had decided to remove Garza from outside work even
before taking Garza to the doctor because of safety concerns. Nevertheless, he admitted to authorizing Garza to work with
another co-worker the Friday and Saturday following the accident. Robles further stated that he would not have made the
recommendation to disqualify, but for the accident.

We address Southwestern Bell's complaint to the submission of the liability question first. 

THE SUBMITTED LIABILITY QUESTION

The cause went to trial on Plaintiff's Fourth Amended Original Petition. The Petition alleged, in pertinent part,

2.5 *** In retaliation for filing a claim under "workers' compensation," Plaintiff was ordered to find a non-driving position
due to the accident and injury, even though the injury was not his fault. Without driving privileges, Plaintiff was
effectively disqualified from his job as an outside plant technician. ***

2.7 On or about January 30, 1995, Plaintiff was discharged under the pretext that there were no non-driving jobs available
for him.

2.8 As a direct and proximate consequence of the unlawful termination of Plaintiff, . . .

3.1 ***As a result of plaintiff filing a workers' compensation claim, Defendant embarked upon a plan to terminate his
employment with Southwestern Bell, in violation of the Texas Workers' Compensation statutes. Defendant did in fact
harass and intimidate Plaintiff. *** Plaintiff's subsequent discharge was therefore wrongful and in direct retaliation to the
fact that Plaintiff filed a claim for workers' compensation.

5.1 As a direct and proximate result of the Defendant's retaliatory discharge under the Texas Workers' Compensation
Actand wrongful conduct . . .

(emphasis ours)

The trial court charged the jury with the following:

Did SOUTHWESTERN BELL disqualify or discharge David Garza from his Outside Plant Technician (OSPT) position
because he instituted or caused to be instituted a workers' compensation claim in good faith?

There may be more than one cause for an employer decision. An employer does not disqualify ordischarge an employee
for instituting or causing to be instituted a workers' compensation claim in good faith, if the employer would
havedisqualified or discharged him when it did even if the employee had not instituted or caused to be instituted a workers'
compensation claim in good faith. (10)

(emphasis ours).

Southwestern Bell argues that the liability question, as submitted, was improper because it was phrased disjunctively and
that the jury's affirmative answer may not, therefore, support the entry of a valid judgment. The argument urges that, as
answered, it is impossible to determine whether the jury found that Southwestern Bell "discharged" Garza or whether it
"disqualified" him. Southwestern Bell relies principally on the holding in Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378
(Tex. 2000). In Crown Life, the Texas Supreme Court held that "when a trial court submits a single broad-form liability
question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court
cannot determine whether the jury based its verdict on an improperly submitted invalid theory. Id. at 389. This reasoning
was, of course, not a new pronouncement. See Lancaster v. Fitch, 112 Tex. 293. 246 S.W. 1015, 1016 (1923) (reaffirmed
in Crown Life, 22 S.W.3d at 389). Accordingly, when a single broad-form liability question erroneously commingles valid
and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be
determined whether the improperly submitted theories formed the sole basis for the jury's finding. Crown Life at 389.
Nevertheless, if the questions are submitted in a manner that allows the appellate court to determine that the jury's verdict
was actually based on a valid liability theory, the error may be harmless. Id.

At the outset, we note that at the charge conference the trial court inquired of the parties if either had any objection to the
proposed question on liability. Counsel for Southwestern Bell stated, "No." Given one further opportunity to voice
objections to the proposed question, counsel for Southwestern Bell merely acknowledged a typographical error.

The Court: . . . Any further objections?

(Defense counsel): No, your Honor. I am looking at the copies. I just noticed one on the first question, you know, on the -

(Plaintiff counsel): It says "disqualify of." It should say "disqualify or."

The Court: Right. I was going through the damage question and just make your correction on yours and I will correct it
in mine It has of instead of or in the first question.

(Defense counsel): Did Southwestern Bell disqualify or discharge in or discharge. I've got it.

Assuming arguendo, that the question commingled valid and invalid liability theories, which we will hereinafter
demonstrate that it did not, under the instructions in Crown Life, Southwestern Bell was still required to timely and
specifically object to preserve its present complaint on appeal. In the case before us, Southwestern Bell neither timely nor
specifically objected to the form of the question. (11) Crown Life, 22 S.W.3d at 389. Error was not preserved for review.Cf.
Molina v. Moore, 33 S.W.3d 323, 328-29 (Tex. App.--Amarillo, 2000 no pet. ) (failure to object to form of damages issue.) 
Nor may an appealing party raise a new objection for the first time on appeal. See Tex. R. App. P. 33.1(a); Tex. R. Civ. P.
274. 

We are not persuaded that Southwestern Bell's reliance on Crown Life is, in any event, a justifiable one.

Section 451.001 of the Texas Labor Code provides:

A person may not discharge or in any other manner discriminate against an employee because the employee has:

(1) filed a workers' compensation claim in good faith

 

Tex. Lab. Code Ann. § 451.001 (Vernon 1996) (emphasis ours).

Clearly, the portions of Garza's Fourth Amended Original Petition set out above demonstrate his reliance upon all of the
options afforded by the statute. The legislature did not limit the prohibited conduct to discharge alone. Any discriminatory
job action against an employee is covered under the anti-retaliation statute. See Battin v. Samaniego, 23 S.W.3d 183, 189
(Tex. App.--El Paso 2000, pet. denied). In its brief, Southwestern Bell acknowledges that Garza's petition alleged a
"discharge" and a "disqualification" but urges that disqualification is not discrimination. In fact, Southwestern Bell's
position throughout trial admitted a "disqualification" but sought to justify the act under its operative policies. Additionally,
Southwestern Bell sought to justify Garza's discharge, which it termed "a separation from employment" due to operative
provisions of the contract between itself and the union, as a legally justifiable act. 

In its brief, Southwestern Bell states, "If Garza claimed he was discriminated against in violation of Section 451.001 relief
for 'discriminatory' conduct, he should have pleaded and proved discrimination which he did not, rather than pleading and
submitting disqualification as a basis of liability. . . . In the case before this Court, discrimination was neither alleged, nor
proven and was certainly not submitted properly."

Although the petition never specifically mentioned the word "discrimination", a clear reference to the statute itself placed
Southwestern Bell on notice that a claim of discrimination was an option available, however it may have been phrased.
Garza's claim of disqualification sufficiently apprised Southwestern Bell of a form of discrimination. Moreover,
Southwestern Bell does not now claim that it was surprised that the term "disqualification" referred to a type of
discrimination. (12)

A pleading must provide "a short statement of the cause of action sufficient to give fair notice of the claim involved."Roark
v. Allen, 633 S.W.2d 804, 810 (Tex. 1982); Torch Operating Co. v. Bartell, 865 S.W.2d 552, 554 (Tex. App.--Corpus
Christi 1993, writ denied); see also Tex. R. Civ. P. 47. The test for fair notice is "whether an opposing attorney of
reasonable competence, with the pleadings before him, can ascertain the nature and the basic issues of the controversy and
the testimony probably relevant." State Fid. Mortgage Co. v. Varner, 740 S.W.2d 477, 479 (Tex. App.--Houston [1st Dist.]
1987, writ denied). Specific statutory references are unnecessary. Colbert v. Dallas Joint Stock Land Bank of Dallas, 129
Tex. 235, 102 S.W.2d 1031, 1033 (1937).

The Colbert court made clear that the statutes and rules contemplate that a petition allege the facts out of which the rights
of the plaintiff have grown and not the presentation of the theory or theories of law applicable to the facts alleged or that the
allegations of fact be fitted into a form or forms of action. Id.

The fact that Garza did not refer to "disqualification" as a discrimination in his petition is of no moment because his
petition gave Southwestern Bell ample notice that his claim of "wrongful conduct" was for wrongful discrimination as well
as wrongful termination. Cf. Broom v. Brookshire Bros., Inc., 923 S.W.2d 57, 60 (Tex. App.--Tyler 1995, writ denied); see
also Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 896 (Tex. 2000).

If Southwestern Bell questioned what was being pled, it had the option of specially excepting and having the pleadings
clarified. Tex. R. Civ. P. 90, 91. (13) The general rule is that the pleadings will be construed as favorably as possible to the
pleader. Gulf C.S.F. Ry. Co. v. Bliss, 368 S.W.2d 594, 599 (Tex. 1963). A party waives its complaint of any defect,
omission, or fault in the pleadings if the party fails to specifically object before the submission of the charge to the jury.
SeeTex. R. Civ. P. 274; Tex. R. App. P. 33.1; City of Fort Worth v. Zumlich, 29 S.W.3d 62, 73 (Tex. 2000). Termination
and disqualification (or any other forms of discrimination) are valid legal theories of recovery under the statute. Thus, there
is no prohibition against submitting them as a single question. Trial courts are, in fact, admonished to submit jury
questions in broad form when feasible, accompanied by appropriate instructions and definitions. It is particularly
appropriate to do so when the jury question relates to multiple legal theories to avoid the risk of confusing the jury.
Hyundai v. Rodriguez, 995 S.W.2d 661, 663-64 (Tex. 1999).

We acknowledge some difficulty in addressing Southwestern Bell's liability contention because of numerous internal
inconsistencies within the positions assumed in its brief. The issue, as formulated, reads:

The trial court erred in submitting Question No. 1 that inquired whether Defendant "discharged" plaintiff in violation of
Texas Labor Code Section 451.001 because the live pleading at trial sought damages only for "disqualification." 

The argument in Southwestern Bell's brief, on the other hand, contains the following statements, which are inconsistent
with the issue, presented on appeal:

Garza sued Southwestern Bell, alleging that it "discharged" Garza in retaliation for his having taken action under the Texas
Workers' Compensation Act and sought actual and exemplary damages.

Garza contends in his pleadings that he had been discharged from employment with Southwestern Bell.

. . . Garza's live pleadings asserted only that his January 30, 1995, "discharge" was the actionable conduct for which
Southwestern Bell was liable.

In other statements contained in its brief, Southwestern Bell states, "the focus of Southwestern Bell's challenge here is not
solely or even primarily that the question in and of itself was defective; rather the focus of the challenge is that the jury's
answer to the question is irreconcilable in light of the live pleadings, in light of the evidence, and in light of the burden on
Garza to prove a cause of action under Section 451.001."

In its next breath, Southwestern Bell states, "Because the jury question was fatally defective, it is impossible to determine
from the jury's answer and from the judgment in this case whether the question refers to liability for disqualification (not
actionable under Section 451.001) or whether the question refers to discharge."

Perhaps Southwestern Bell's real argument focuses on Garza's damages

allegation which reads:

As a direct and proximate result of the retaliatory discharge under the Texas Workers' Compensation Act and wrongful
conduct of the Defendant, Plaintiff suffered actual and special damages as set out below:

(emphasis ours).

If Southwestern Bell's contention is that the above allegation seeks damages only for retaliatory discharge, the contention is
clearly without merit. Southwestern Bell is given adequate notice that damages are also sought for the wrongful conduct
(disqualification) previously described in earlier parts of Garza's petition.

The trial court's submission to the jury of the liability question did not offend the admonitory warnings in Crown Life v.
Casteel because the question, as formulated, did not commingle a valid with an invalid liability theory. Southwestern Bell's
liability submission challenge is overruled. We now address the sufficiency challenges to the jury finding on the liability
issue. 

Southwestern Bell contends that the evidence is legally and factually insufficient to support the judgment for Garza because
Garza did not prove a causal connection between his compensation claim and his disqualification and termination.

STANDARD OF REVIEW

In reviewing the evidence for legal sufficiency, we consider only the evidence and inferences, viewed in their most
favorable light, which support the jury's findings and disregard all evidence and inferences to the contrary. Redman Homes,
Inc. v. Ivy, 920 S.W.2d 664, 667 (Tex. 1996). Anything more than a scintilla of evidence that is more than a basis for mere
surmise or suspicion is legally sufficient to support the finding. Sherman v. First Nat'l Bank in Center, Tex., 760 S.W.2d
240, 242 (Tex. 1998). If the evidence provides a rational basis for reasonable minds to differ as to the existence of a vital
fact, there is some evidence or more than a scintilla. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).

We evaluate a factual sufficiency challenge by reviewing all evidence and reasonable inferences therefrom and sustain the
challenge only if the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). Only if a finding "shocks the conscience" or is "manifestly unjust,"
is it subject to reversal. Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 30-31 (Tex. 1994) In making this evaluation, we may
not simply substitute our judgment for that of the fact finder in the lower court, particularly with regard to assessing the
credibility of the witnesses. Paragon Hotel Corp. v. Ramirez, 783 S.W.2d 654, 658 (Tex. App.--El Paso 1989, writ
denied). A finding will be sustained if there is some probative evidence to support it and provided it is not against the great
weight and preponderance of the evidence. Carrasco v. Goatcher, 623 S.W.2d 769, 772 (Tex. App.--El Paso 1981, no
writ). Additionally, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence
when the opposing party fails to object to the charge." Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000).

BURDEN OF PROOF UNDER LABOR CODE § 451.001

Circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the filing
of a workers' compensation claim. See Cont'l Coffee Prods. v. Cazarez, 937 S.W.2d 444, 450-51 (Tex. 1996). The
Texas Supreme Court has established the standard of causation for this purpose: the employee's protected conduct must be
such that, without it, the employer's prohibited conduct would not have occurred when it did. Id. at 451 n. 3.

Thus, Garza was required to prove that, but for his filing of a workers' compensation claim, Southwestern Bell would not
have discriminated against him or discharged him when it did. A plaintiff may show the causal connection by
circumstantial evidence and by reasonable inferences from it. Am. West Airlines, Inc. v. Tope, 935 S.W.2d 908, 912 (Tex.
App.--El Paso 1996, no writ ). 

Circumstantial evidence that may show this causal link includes (1) knowledge of the compensation claim by those making
the decision to discriminate or terminate; (2) a negative attitude toward the employee's injured condition; (3) failure to
adhere to established company policies; (4) discriminatory treatment of the injured employee in comparison to similarly
situated employees; and (5) evidence that the stated reason for the discharge was false. Cont'l Coffee, 937 S.W.2d at
451;Gorges Foodservice, Inc. v. Huerta, 964 S.W.2d 656, 665 (Tex. App.--Corpus Christi 1997, no writ). The workers'
compensation claim need not be the sole cause of the termination. Cont'l Coffee, 937 S.W.2d at 450-51. The evidence is
sufficient if it shows that the claim was a contributing factor in the employer's decision to discriminate or discharge the
employee. Azar Nut Co .v. Caille, 720 S.W.2d 685, 687 (Tex. App.--El Paso 1986), aff'd 734 S.W.2d 667 (Tex. 1987).

Once Garza met this burden, the burden shifted to Southwestern Bell to rebut the alleged discrimination or termination by
showing that there was a legitimate reason for its actions. Tex. Animal Health Comm'n v. Garza, 27 S.W. 3d 54, 60
(Tex.App. - San Antonio 2000, no pet.) (citing Tex. Dep't of Human Servs. v. Hinds, 904 S.W.2d 629, 636 (Tex. 1995)).
Thereafter the burden shifted back to Garza to produce controverting evidence that the motive was retaliatory. Tex.
Division-Tranter, Inc. v. Carrozza, 876 S.W.2d 312, 313-14 (Tex. 1994) (per curiam); Terry v. S. Floral Co., 927 S.W.2d
254, 257 (Tex. App. --Houston [1st Dist.] 1996, no writ); see also Duhon v. Bone & Joint Physical Therapy Clinics, 947
S.W.2d 316, 319 (Tex. App.-Beaumont 1997, no writ); Jenkins v. Guardian Indus. Corp., 16 S.W.3d 431, 436 (Tex.
App.-Waco 2000, no pet). Retaliatory motive may be established by either direct or circumstantial evidence. Carrozza,
876 S.W.2d at 314.

1. Knowledge of the compensation claim

by those making the decision on termination.


Robles, Gonzalez and Rider learned of Garza's workers' compensation claim at or within days of Garza's visit to the doctor.
Robles, in fact, transported Garza to the doctor on October 24, 1994 when Garza reported the injury. He also filled out the
worker's compensation form. Robles communicated Garza's injury to Gonzalez, who in turn communicated it to Rider.

2. Expression of a negative attitude 

toward the employee's injured condition.


There is no evidence that Southwestern Bell ever demeaned Garza's injury, because the injury, in fact, was so minor that it
was a non- issue. However, Southwestern Bell's negative attitude toward medical claims in general and Garza's injury in
particular was not only attested to by witnesses, but is chronicled in its own documents. Garza was initially only counseled
to work effectively with others on the day of the accident. Only upon seeking medical attention and causing a worker's
compensation claim to be filed, did management find reason to target Garza and to embark upon a discriminatory course of
conduct giving rise to an illusory excuse for termination.

Initial investigations did not recommend serious action against Garza. Gonzalez investigated the entire incident and
determined only that both workers should be "placed on a step of positive discipline for effectiveness with others." No
discipline was contemplated against Garza for safety violations. To the contrary, Garza was assigned to complete the
project he was working on at the time of the accident because he was, according to management, one of the company's most
proficient employees, to a fault.

Only after Garza sought medical treatment on October 24, 1994 did management change its attitude. Thereafter, the
uncontroverted evidence established Gonzalez's and Rider's animosity to the claim process which they directed towards
Garza. Rider immediately rejected Robles' recommendation in his "Flash Report" wherein Robles had indicated that no
further investigative committee would be appointed. Rider summarily changed the "Flash Report" to reflect that the
"accident will be investigated . . . ." Rider first wrote "and if employee contributed to the cause of the accident, disciplinary
action will be initiated," but subsequently crossed out the conditional language, and, in very telling language, decisively
stated, "disciplinary action will be administered after investigation." Thus, it was a foregone conclusion that Garza would
be punished, regardless of the outcome of the investigation. Garza was about to be subjected to what management would
later admit was pure "window dressing."

The investigative committee, which was composed of labor and management, concluded that it could not "determine the
exact cause of the accident" because there were conflicting stories and no witnesses. It suggested some measures that could
be taken with respect to both employees, but never mentioned disqualification from driving. Neither of the preliminary
investigations recommended such a devastating measure, because, clearly Garza was not driving when he was injured.

The negative attitude continued. Rider and Gonzalez undertook a campaign of resurrecting every miniscule incident in
Garza's twenty-year work history, whether related to driving or not, and whether any fault was allocated to Garza. Gonzalez
then, at the behest of Rider, hastily singled out Garza for unnecessarily harsh punishment, which was implemented the very
next day. Had Garza merely sought first aid or hidden his injury through subterfuge by taking vacation as Hernandez had
once done instead of seeking medical attention, the incident would not have been placed in his record. By seeking medical
attention, incidents are transformed into "accidents" which may be used as grounds for future discipline, as was done with
Garza. The jury was justified in concluding that Southwestern Bell employees are dissuaded from exercising valuable
statutory rights under a fear of employment repercussions, including the forfeiting of their employment.

3. Failure to adhere to established company policies.

The jury heard evidence relating to Southwestern Bell's inexplicable failure to adhere to its own documented policies.
Gonzalez testified that it was company policy to enter incidents into personnel files of involved employees. Nevertheless,
the policy was not carried out against Hernandez, who was primarily at fault for the October 20, 1994 incident. Gonzalez
could offer no explanation as to why the policy had not been followed. Company policy was not followed in other aspects
of Garza's treatment as well.

The jury also heard that Southwestern Bell did not adhere to its driving safety policy when it disqualified Garza from
driving. Company policy set out specific standards for driving and for disqualification from driving jobs. These
circumstances included having traffic violations, or three unsafe acts "while operating a motor vehicle," within the course
of twenty four months.

There was no testimony that Garza had any traffic violations "while operating a motor vehicle," nor was there any evidence
of repeated safety violations during the twenty four month period preceding his disqualification. Thus, according to the
very terms of Southwestern Bell's own policy, there was no legitimate basis for disqualifying Garza from driving jobs.

Finally, Rider admitted that he deviated from Southwestern Bell's annual appraisal policy in dealing with Garza by
scrutinizing his entire history at a time not normally scheduled for review. There was evidence that this was not the usual
procedure.

 Evidence that an employer fails to follow established policy toward an employee is probative of motivation. A reasonable
jury could conclude that Southwestern Bell intentionally disregarded its own established policies in dealing with Garza.

4. Discriminatory treatment in comparison to similarly situated employees.

The evidence is replete with testimony indicating that Garza was singled out for distinct and harsh treatment in comparison
to other similarly situated employees. Hernandez's preferred treatment alone sufficed to provide the jury with a measuring
device. 

The investigating committee that looked into the incident was much more critical of Hernandez than it was of Garza. It
concluded that Hernandez had failed to look out, failed to warn Garza he was overhead, and failed to exercise due care
when he dropped a cable wire near Garza. Notwithstanding the committee's findings, management chose to simply focus
narrowly on Garza and disregard any participation by Hernandez.

Although Garza's injury ultimately culminated in his termination, Hernandez's safety record escaped unscathed.
Hernandez's annual evaluation for 1994 disclosed the notation "works well with his peers," contrary to the recommendation
initially made by Gonzalez when he assessed Hernandez "a step of positive discipline" for "effectiveness with others."

After Garza was disqualified from his outside plant technician position, he was assigned to clean out equipment storage
facilities. Garza insisted that during this period he was assigned to do the lowest level work in the department, including
janitorial tasks which none of the other employees were required to perform. Management witnesses vehemently denied it
and explained that all employees took turns rearranging the equipment. Moreover, they explained that Garza was, during
this period, given ample opportunity to study for upcoming technical examinations to qualify him for another position.

Finally, although Garza possessed seniority over Hernandez in surplus situations, Hernandez was given preference over
Garza on at least one occasion.

This constitutes probative evidence suggesting discriminating treatment of Garza in comparison to other employees in
similar situations.

5. Evidence that the stated reason for the discharge was false.

Southwestern Bell contends that it did not have a motive to discriminate against Garza. Although Southwestern Bell has
never admitted that it terminated/discharged Garza, choosing instead to call it "separation from employment due to the
operation of the terms of the Collective Bargaining Agreement (the contract)," it has sought to justify the results by arguing
that Garza voluntarily abandoned twenty years of accrued benefits and forfeited his opportunity to continue in his
employment.

After Garza lost his driving privileges, he was given sixty days to find a non-driving job within the company. Within that
short period of time he attempted to qualify himself for other positions by studying and taking examinations. He was not
able to successfully qualify himself beyond his current outside plant technician position.

Unlike his co-workers, Garza was not offered jobs in the Valley. He was given an ultimatum of moving to San Antonio to
get a non-driving position at reduced pay or leave the company. He was denied work opportunities within commuting
distance of his home in Brownsville even though he had expressed a willingness to work anywhere in the Rio Grande
Valley. 

Other employees with less seniority were allowed to continue working in the Valley with jobs that the company classified
as "driving jobs" even when the driving was incidental, such as traveling from one office to another. These subsequent
employment decisions permitted the jury to reasonably infer that Garza's filing of a claim was a least one cause of
Southwestern Bell's adverse employment decision to disqualify and discharge him. 

After Garza was declared ineligible for positions requiring driving, Rider showed his magnanimity by displaying a
willingness to assist Garza in obtaining work with Southwestern Bell as a subcontractor doing the same thing he had
always done as an outside plant technician. Rider made this incredible admission that the company was willing to have
Garza drive around doing jobs for it while at the same time insisting that he was such a safety risk that he could not be
trusted to drive.

The jury was surely justified in piercing the veil of hypocrisy being dangled before it by Rider to conclude that the stated
reason for discharge was simply a pretext.

Viewing the evidence in accordance with the applicable standard, that is, in the light most favorable to the verdict and
disregarding all else, we find that the circumstantial evidence and the inferences that could be drawn from that evidence
constituted some evidence of a causal connection between Garza's worker's compensation claim and his disqualification
and ultimate discharge.

Southwestern Bell's Controverting Evidence

In order to controvert Garza's evidence, Southwestern Bell presented the testimony of various employees and management
personnel who discussed Garza's work history and alleged bad safety record. Most of the accidents Southwestern Bell
offered as a basis for the disqualification were either "no fault" incidents or did not involve driving at all. A sampling of
these incidents are as follows:

 

 

 


 On September 3, 1978, Garza stepped on a board with a nail in grass while cutting cable pair.


 

 

 


 On July 17, 1979, a non-company vehicle driven by a Mexican national stopped abruptly and improperly at an
intersection and a company vehicle driven by Garza ran into it.


 

 

 


 On September 19, 1979, Garza strained a shoulder while lifting a heavy manhole cover.


 

 

 


 On February 25, 1980, a non-company vehicle failed to yield the right of way and struck a company vehicle driven by
Garza.


 

 

 


 On March 9, 1981, Garza slipped on a muddy step and sprained his right knee.


 

 

 


 In 1992, a pole in a truck driven by Garza struck the windshield of another vehicle driving behind him because Garza's
co-worker Hernandez failed to position himself between the pole trailer and other traffic as required.



Rider denied that Hernandez's driving record was anywhere as serious as Garza's. Southwestern Bell offered evidence that
the reason Garza was required to move to San Antonio was due to a general shift in its Rio Grande Valley workforce.
Moreover, management insisted that the reason he was offered a position in San Antonio only was because he was
disqualified from driving and had not tested qualified for any other position in the Valley.

Rider testified that Garza was not treated any different than Hernandez or any of its other employees affected by the "force
adjustment," inasmuch as all affected employees were required to find other employment within the company or leave its
employ under the terms of the Collective Bargaining Agreement, regardless of whether a compensation claim had been
filed.

Southwestern Bell's evidence presents nothing more than a conflict in positions for the fact finder to resolve. Conflicting
evidence permits an inference that Southwestern Bell's stated reasons for disqualification and discharge were false.

It is fundamental that a jury may believe all, some or none of a witness' testimony. Aboud v. Schlichtemeier, 6 S.W.3d 742,
749 (Tex. App.--Corpus Christi 1999, pet. denied). We believe that, although the jury would have been free to accept
Southwestern Bell's evidence and arguments and find in its favor, they were not so compelling as to require that we set
aside the jury finding as being manifestly unjust. We overrule Southwestern Bell's legal and factual sufficiency challenges
to the jury finding that it violated the anti-retaliation statute.

 ERROR IN ADMITTING EVIDENCE

When former union vice-president Vasquez testified regarding her participation at the grievance hearing, she referred to
notes that she personally wrote as part of her responsibilities as union representative. Vasquez, relying on her notes,
testified, without objection, on several occasions, that at the November 16, 1994 hearing she heard Gonzalez state that the
investigation and action were a result of Garza going to the doctor. She further testified, independent of any notes, that at
the November 30, 1994 hearing she heard Rider state that if Garza had not gone to the doctor he wouldn't be sitting there in
the position of getting a non-driving job.

On appeal, Southwestern Bell complains of the admission into evidence of Plaintiff's exhibits Nos. 17 and 18 over its
objection. Exhibit No. 18 consists of Vasquez's handwritten notations with the entry, " On 11- ____ & Ryder sd if
Davidwould not hv gone to Dr nothing would have been done." The notation does not appear in Exhibit No. 17 as claimed
by Southwestern Bell. There does, however, appear the notation," (unintelligible) for seeking for medical help. If had not
gone for medical aid & since he did will be penilized bcuz reptd."

We observe that Southwestern Bell's overly concise presentation offers no references to the record and is unsupported by
authorities as required by the rules. See Tex. R. App. P. 38.1 (h). This court will not conduct a legal analysis for
Southwestern Bell, nor speculate what its complaint might be. In any event, the complaint, as we best understand it,
appears to be without merit. The notations complained about are essentially, if not identical, to the testimony offered
without objection.

To obtain the reversal of a judgment based upon an error of the trial court in admission or exclusion of evidence, it must be
shown that the trial court did in fact commit error and that the error was reasonably calculated to cause, and probably did
cause, the rendition of an improper judgment. McCraw v. Maris, 828 S.W.2d 756, 757 (Tex. 1992); Gee v. Liberty Mut.
Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989). The erroneous admission of evidence that is merely cumulative of
properly admitted evidence is harmless. Gee, 765 S.W.2d at 396. This is especially true when the cumulative evidence is
admitted without objection. City of Austin v. Houston Lighting & Power Co., 844 S.W.2d 773, 792 (Tex. App.--Dallas
1992, writ denied). Since the same evidence was already before the jury, any error committed by the trial court in admitting
the exhibits was harmless and cannot constitute reversible error.

ERROR IN EXCLUDING EVIDENCE

Southwestern Bell next complains of the trial court's ruling excluding its Exhibit No. 37, which consists of an officer's
certificate with deposition by written questions directed to Dennis Dobbs, president of the union, together with attached
notes of Diana Vasquez and typewritten notes taken at the hearing on November 11, 1994. Exhibit 37 is an exact duplicate
of Garza's Exhibits 17 and 20. (14) Southwestern Bell may not complain about the admission of an opponent's exhibit and
also complain of its exclusion. 

Southwestern Bell further complains of the trial court's exclusion of its Exhibit No. 37 "Court Only." This exhibit, which
Southwestern calls "the arbitration award," consists of the arbitrator's decision that the grievance is not arbitrable and the
subsequent denial. 

Exhibit No. 37 was marked and offered immediately prior to Southwestern Bell resting its case. When the trial court
inquired about the purpose for the exhibit, defense counsel replied that he merely sought to demonstrate that the witness
indicated in his response that the exhibit contained all of the items requested in the subpoena duces tecum. (15) No mention
was made of any relevancy regarding the documents pertaining to the attempted arbitration.

On appeal Southwestern Bell avers that the excluded documents would have assisted the jury in its understanding of the
mandatory provisions of the contract and the effect upon Garza with respect to his separation from employment. No
attempt was made at trial to disclose how the intended use might have been beneficial to the jury. Cf. Domingues v. San
Antonio, 985 S.W.2d 505, 507 (Tex. App.--San Antonio 1998, pet. denied). Nor is any attempt made before this court.
Moreover, Southwestern Bell had numerous opportunities through its various management witnesses to accomplish what it
now deems urgent. 

For the exclusion of evidence to constitute reversible error, the complaining party must show (1) that the trial court
committed error and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper
judgment. McCraw, 828 S.W.2d at 757. Since part of the exhibit was merely cumulative of other evidence already
admitted, it was not error to deny duplication. Gee, 765 S.W.2d at 396; Wilson v John Frantz Co., 723 S.W.2d 189, 194
(Tex. App.--Houston [14th Dist.] 1986, writ ref'd n.r.e.).

In considering the entire record before us, we cannot imagine how the exclusion of these documents might reasonably be
calculated to cause the rendition of an improper judgment.

 THE MENTAL ANGUISH AWARD

In three separate issues, Southwestern Bell complains about the legal and factual sufficiency of the evidence to support the
jury's mental anguish award, about the trial court's denial of its requested mental anguish instruction, and about the trial
court's refusal to require a remittitur. Southwestern Bell has neither briefed nor argued its assigned issue on the court's
refusal to give its requested instruction. We, therefore, consider the contention to have been intentionally waived. Duperier
v. Tex. State Bank, 28 S.W.3d 740, 746 n.2 (Tex. App.--Corpus Christi 2000, pet. dism'd by agr.); Steptoe v. True, 38
S.W.3d 213, 214 n.1 (Tex. App.- Houston [14 th Dist.] 2001 no pet.).

Past mental anguish

The jury awarded $300,000.00 as past compensatory damages and $300,000.00 as future compensatory damages. Each
submitted question permitted various elements to be considered. These were: emotional pain and suffering, inconvenience,
mental anguish, loss of enjoyment of life, and other pecuniary losses. Southwestern Bell's complaint focuses only on the
mental anguish component. We, therefore, confine our review solely to mental anguish as well.

We review the award of mental anguish damages by a sufficiency of the evidence standard. See Larson v. Cactus Util. Co.,
730 S.W.2d 640, 641-42 (Tex. 1987). We will sustain an award of damages for mental anguish, if there is direct evidence
of the nature, duration, and severity of a plaintiff's anguish which establishes a substantial disruption in their daily routine,
or in the absence of direct evidence, the court will search for other evidence of a "high degree of mental pain and distress
that is more than mere worry, anxiety, vexation, embarrassment, or anger." See Parkway Co. v. Woodruff, 901 S.W.2d 434,
444 (Tex. 1995); Saenz v. Fid. & Guaranty Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996). Direct evidence may be
supplied through the plaintiff's own testimony, the testimony of a third person or through an expert witness. Parkway, 901
S.W.2d at 444. 

 Compensable mental anguish includes a mental sensation of pain resulting from "such painful emotions as grief, severe
disappointment, indignation, wounded pride, shame, despair or public humiliation or a combination of any of
these."Wal-Mart Stores, Inc. v Odem, 929 S.W.2d 513, 528 (Tex. App.--San Antonio 1996, writ denied). But "mere
emotions" will not rise to a compensable level. Parkway, 901 S.W.2d at 445; Saenz, 925 S.W.2d at 614; Republic Ins. Co.
v. Stoker, 903 S.W.2d 338, 343 (Tex. 1995) (Spector, J. concurring). But damages, however, may be implied from illness
or injuries accompanied by physical pain that is proximately caused by the defendant. Pittsburgh Corning Corp. v.
Walters, 1 S.W.3d 759, 780 (Tex. App.- Corpus Christi 1999, no pet.).

While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in
finding damages, that discretion is limited. Burlington Coat Factory Warehouse of El Paso, Inc. v. Flores, 951 S.W.2d
542, 548 (Tex. App.--El Paso 1997, no writ). Juries cannot simply pick a number and put it in the blank. Saenz, 925
S.W.2d at 614. Juries must find an amount that, in the standard language of the jury charge, "'would fairly and reasonably
compensate' for the loss." Id.

The jury heard from both Garza and his wife about the nature and extent of his mental anguish. Garza testified that he was
unable to sleep at night as a result of his discharge. He felt powerless to financially support his family as he had for twenty
years and felt bad about not being able to assist his son who was about to finish college. (16) He described being constantly
angry, depressed and uncommunicative, clamming up emotionally to the point that it affected the relationship with his wife
and created problems in his marriage. He remains angry and often gets upset that Hernandez is still with Southwestern Bell
drawing his regular paychecks with all the benefits while he has none of the benefits he once provided his family. His
demeanor was affecting his entire family.

Garza's wife, Blanca, testified that her husband's discharge made him a changed man. She described him as being stressed
out, lacking in self-confidence, and constantly worried. He became distant, had trouble facing her and the children, and
experienced loss of sleep which continues to the present. According to Blanca, her husband, affected by worry, often goes
to sleep, wakes up in the middle of the night unable to return to sleep and watches television consumed with worry about
providing for his family. The anguish, she said, finally caused marital discord, causing them to separate for one month in
1995, and again from February through June of 1997. She described his anguish as persisting since the discharge.

We find the testimony by the Garzas not unlike that in Wyler Indus. Works, Inc. v. Garcia, 999 S.W.2d 494, 508-09 (Tex.
App.--El Paso 1999, no pet.). In Wyler, Garcia experienced humiliation "like crying inside" over the loss of his dream job,
experienced sadness, loss of self esteem, loss of sleep, marital problems, emptiness, concern over inability to pay mounting
child support payments, financial concerns in general, and loss of interest in everything with a constant desire to sleep all
day. Five years after his discharge Garcia was still experiencing anger toward his former employer. The court recognized
that evidence of marital discord, even if brief in nature, can be sufficient to show a substantial disruption in daily routine
over and above mere worry, anxiety, vexation, embarrassment, or anger.

Several other cases bear a remarkable similarity. In Tope, the court found sufficient evidence to support an award of
$180,000.00 for past mental anguish where Tope felt a tremendous loss of what he perceived to be his career job. 935
S.W.2d at 916. His termination came at a time when he was still experiencing physical disability. Tope experienced anger,
fear, insecurity, helplessness, devastation, and continuing anger.

In Garza, the court sustained an award of $125,000.00 for past mental anguish. 27 S.W.3d at 63. Garza experienced
humiliation and embarrassment at the hands of his former supervisor. His wife described him as irritable, depressed,
uncommunicative and under tremendous stress. She noticed physical changes such as weight loss, sleeplessness, and a
breakout of hives, all of which continued to exist at time of trial. Garza additionally felt a loss of manhood because of
inability to provide for his family.

In Metal Indus., Inc. of California v. Farley, 33 S.W.3d 83, 89-90 (Tex. App.-- Texarkana 2000, no pet.), an award for
mental anguish was sustained where the evidence demonstrated that Farley suffered distress, hurt, loss of self-esteem,
devastation, fear, anger, feelings of betrayal, sleeplessness, nervousness, irritability, and disappointment.

In Colonial County Mutual. Ins. Co. v. Valdez, 30 S.W.3d 514, 526 (Tex. App.- Corpus Christi 2000, no pet.), this Court
upheld a mental anguish award in a DTPA/Insurance Code case where Valdez testified that he felt deceived, "very mad,"
powerless and suffered health problems in the form of high blood pressure and sleeping disorders. See also Vickery v.
Vickery, 999 S.W.2d 342, 378 (Tex. 1999) (Hecht, J. Dissent); (17) Norwest Mortgage, Inc. v. Salinas, 999 S.W.2d 846, 862
(Tex. App.- Corpus Christi 1999, no pet.). 

We hold that Garza provided direct evidence showing that the nature, duration, and severity of his mental anguish created a
substantial disruption of his daily routine. We find the above evidence is factually sufficient to support the jury finding of
past mental anguish.

Future mental anguish

By definition, future mental anguish has not yet occurred, and, therefore, is speculative and based on probabilities.
Damages for future mental anguish are recoverable "if there is a reasonable probability that they will be suffered in the
future." Hicks v. Ricardo, 834 S.W.2d 587, 590 (Tex. App.--Houston [1st Dist.] 1992, no writ); Lubbock County v. Strube,
953 S.W.2d 847, 857 (Tex. App.- Austin 1997, pet. denied). 

Future mental anguish is measured by the same standard as past mental anguish and may not be awarded without either
"direct evidence of the nature, duration, or severity of [plaintiff's] anguish, thus establishing a substantial disruption in the
plaintiff's daily routine," or other evidence of "'a high degree of mental pain and distress' that is 'more than mere worry,
anxiety, vexation, embarrassment, or anger.'" Saenz, 925 S.W.2d at 614. We reexamine the testimony for evidence of
reasonable probability. 

Garza remains bitter, resentful and angry about the loss of his job with the security and benefits he expected after twenty
years in the company. He gets angry every time he thinks about it, which occurs several times a week, although not as
often as before. He remains disillusioned about not being able to purchase his own home, which he expected to do with his
previous annual salary of $40,000.00. He is bitter about seeing fellow coworkers receiving employment longevity awards,
which he would have been eligible for by the time of trial. The resentment keeps him awake at night.

Blanca described her husband's sleep disorder as frequent and continuing. He continues to worry about his ability to
provide for his family. He has developed a drinking habit that strains a prior closeness in their marital relationship because
he now does his drinking away from home.

 Historically, whether conduct is reasonable is ordinarily a question of fact. Adam Dante Corp. v. Sharpe, 483 S.W.2d 452,
456 (Tex. 1972). Moreover, the question of reasonableness is one peculiarly tailored to the province of the jury. Tri-State
Wholesale Assoc. Grocers, Inc. v. Barrera, 917 S.W.2d 391, 397 (Tex. App.--El Paso 1996, writ dism'd by agr.).

The question then is, whether a reasonable jury could find that the anguish Garza was experiencing at the time of trial
would more likely then not (18) continue into the future. There is sufficient evidence of the nature, duration and severity of
Garza's mental sufferings to support a finding. We believe that the jury was free to make such a finding and, accordingly,
we will not disturb their finding of future mental anguish.

REMITTITUR OF MENTAL ANGUISH DAMAGES

Southwestern Bell asserts that the trial court erred in denying its request for remittitur of mental anguish damages. Its brief
assigns but three lines to this contention without benefit of authority or argument. This is understandable, because
Southwestern Bell never requested remittitur of the mental anguish award below. On October 8, 1999, it filed its motion
for new trial, or in the alternative, for remittitur. However the instrument never addressed the relief it now claims the trial
court denied. At the hearing conducted on November 23, 1999, the subject matter was never raised. See Dutton v. Dutton,
18 S.W.3d 849, 853 (Tex. App.- Eastland 2000, pet. denied). 

 It is fundamental that a court cannot deny a request not made. This court would be justified in summarily overruling the
contention for failure to comply with the briefing requirements (19) and for raising trial court error for the first time on
appeal. See Tex. R. App. P. 33.1.

Nevertheless, in weighing all of the evidence detailed above, we observe that Southwestern Bell controverted none of the
evidence on mental anguish. We reaffirm our pronouncement that the finding of mental anguish was not so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust and decline to order remittitur. See Larson, 730
S.W.2d at 641; Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998).

THE PUNITIVE DAMAGE AWARD

In order to recover punitive damages under section 451.001 of the Labor Code, a plaintiff must prove that his employer
acted willfully and with actual malice. The requirement that evidence demonstrate ill will, spite, or a specific intent to
cause injury to the employee, courts will ensure that only egregious violations of the statute will be subject to punitive
awards. Cont'l Coffee, 937 S.W.2d at 454. The circumstances surrounding Garza's discharge supports his claim that
Southwestern Bell's conduct was malicious. A cursory recapitulation of the evidence is useful. 

 It is perfectly evident that the October 20, 1994 incident precipitated an elaborate plan or scheme to terminate Garza that
would take him through a lengthy journey of farcical administrative proceedings, later acknowledged to be "window
dressing," that would ultimately result in a claim of voluntary separation. Ironically, the incident giving rise to the first leg
of the journey was a minimum fault accident that had no impact on Garza's job performance and required no further loss of
work time or subsequent medical treatment. Although management took every opportunity to label Garza a safety problem,
it had no reservations about dispatching him back to finish the project he was working on the day of the incident.

The second leg of the journey subjected him to a maze of meaningless disciplinary hearings and investigations with a
predetermined result. In the course of this journey, Garza was alternately described as "irresponsible" and in the next
breath the "best lineman in the organization." At subsequent turns Southwestern Bell employed various pretexts to
disqualify him from every position requiring minimal driving, even though driving had nothing to do with the precipitating
incident. The journey then took an incredibly hypocritical twist unabashedly subjecting him to repeated violations of
established written company policy and culminating in an offer by Rider to employ him as a contractor with the same
requirements and responsibilities he no longer was qualified to perform as an employee.

Finally the trip, having taken a circuitous route, returned to the point of origin with Garza now being given sixty days to
qualify for some other job or leave the company. As a final gesture of derision, Southwestern Bell removed him from all
jobs he had performed for twenty years and delegated him to demeaning janitorial tasks as he sought desperately and
unsuccessfully to study for qualifying technical exams.

Applying the legal and factual sufficiency standards enunciated above, we believe that this is evidence indicative of ill will
and spite, thus sufficiently egregious to support an award of punitive damages. Cf. Whole Foods Market Southwest, L.P. v.
Tijerina, 979 S.W.2d 768, 779-80 (Tex. App.--Houston [14th Dist.] 1998, pet. denied)(where a pattern of behavior by
management commenced immediately after the injury and culminated in use of any available pretext to expedite
termination.)

REMITTITUR OF PUNITIVE DAMAGES

Once again Southwestern Bell has advanced no reason why remittitur should be granted. Assuming that excessiveness is
the motivating factor for the request, an appellant has the burden of establishing that the jury's evaluation of the damages
was erroneous. Mercy Hosp. of Laredo v. Rios, 776 S.W.2d 626, 635 (Tex. App.--San Antonio 1989, writ denied).

This Court has previously stated that the finding of the jury will not be disturbed on grounds of excessiveness if there is any
probative evidence to sustain the award. We will not substitute our judgment for that of the jury unless the record indicates
that the jury was influenced by passion, prejudice, or improper motive. We will grant a remittitur only if, after reviewing
all the evidence, we find that the award is so excessive as to shock our conscience. (20) Tex. Health Enters., Inc. v. Krell,
828 S.W.2d 192, 202 (Tex. App.--Corpus Christi 1992), vacated, 830 S.W.2d 922 (Tex. 1992). As in Tex. Health, the
amount awarded is large, but the mere fact that an award is large is no indication of passion, prejudice or improper motive. 

The award is reasonably proportionate to the actual damages and no suggestion has been made that it was the product of
any impropriety or that the jury disregarded the evidence. The trial court did not err in failing to order a remittitur on the
damages. 

 All of the issues raised on appeal are overruled. The judgment of the trial court is affirmed.



ANTONIO CANTU

Justice





Publish.

Tex. R. App. P. 47.3 (b).



Opinion delivered and filed

this 31st day of August, 2001.

1. Retired Justice Antonio G. Cantu assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to
Tex. Gov't Code Ann. § 74.003 (Vernon 1998).

2. Tex. Lab. Code. Ann. § 451.001 (Vernon 1996).

3. Garza and Hernandez were a working team with an extended history of personality clashes.

4. The investigation initially focused on the possible violence between the employees.

5. The memorandum, in Rider's handwriting, stated, "disciplinary action will be administered after investigation."

6. The committee recommended that both employees undergo counseling and training. However no one enforced the
recommendation.

7. Ironically, supervisor Rider was willing to assist Garza in becoming a subcontractor for Southwestern Bell doing the very
job with the same requirements he was no longer qualified to do as an employee. 

8. Hernandez's safety record revealed that he had once rolled a company vehicle in a one-car accident and rear-ended
another vehicle at an intersection.

9. The grievance hearing was guaranteed Garza under the Collective Bargaining Agreement between the Communication
Workers of America and Southwestern Bell.

10. The question tracked the suggested form in the Texas Pattern Jury Charge. See STATE BAR OF TEXAS, TEX.
PATTERN JURY CHARGE, Employment § 107.5 (1998).

11. A party objecting to a jury charge must point out the objectionable matter distinctly and set out the grounds of the
objection. Tex. R. Civ. P. 274.

12. During final arguments, counsel for Southwestern Bell recognized that the question required a two-part consideration.



(Defense counsel): ". . . there are two parts to this question you are going to have to answer. One has to do with
disqualification, the other has to do with discharge."

13. Southwestern Bell recognizes in its brief that Garza pled, "wrongful conduct" but suggests, "that the common sense
reading of the allegation is that the wrongful conduct was not under the Act."

14. Southwestern Bell asserts that Exhibit No. 37 reveals a conflict in the alleged notation contained in the wrongfully
admitted Plaintiff's Nos. 17 and 18, but does not disclose what the conflict might be. 

15. "Defense counsel : The attached documents are already in evidence, but the testimony from the custodian of records is
not. And I wish to put that in evidence." * * * "The relevancy is that this witness states that these are all the documents in
response to the question."

16. Garza: "I felt real badI let my son down."

17. Vickery v. Vickery, No. 01-94-01004-CV, (Tex. App. --Houston [1st Dist.] 1997, pet denied) (Unpublished opinion
appearing as appendix to published dissent.)

18. The word probable conveys a meaning of more likely than not. See Parker v. Employers Mutual Liab. Ins. Co. of Wis.,
440 S.W.2d 43, 47 (Tex. 1969). Likelihood and probability are synonymous. Robinson v. Argonaut Ins. Co., 534 S.W.2d
953, 958 (Tex. Civ. App.--Fort Worth 1976, writ ref'd n.r.e.). Probability quantified means a more than fifty percent
chance. See Fid. & Guaranty Ins. Underwriters v. Gary Douglas Elec., 48 Ohio App.2d 319, 357 N.E.2d 388 (1974).

19. Tex. R. App P. 38.1; Duperier v. Tex. State Bank, 28 S.W.3d 740, 746 n.2 (Tex. App.-Corpus Christi 2000, pet. dism'd
by agr.). 

20. But see City of La Porte v. Prince, 851 S.W.2d 876, 883 (Tex. App.-Waco 1993)( contra), rev'd other grounds, sub.
nom. City of La Porte v. Barfield, 898 S.W.2d 288 (Tex. 1995).