IN THE SUPREME COURT OF TEXAS















IN THE SUPREME COURT OF TEXAS

 

════════════

No. 01-1142

════════════

 

Southwestern Bell Telephone
Co., Petitioner,

 

v.

 

David Garza, Respondent

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Thirteenth District
of Texas

════════════════════════════════════════════════════

 

 

Argued
October 15, 2003

 

 

Justice Hecht
delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE
OWEN, JUSTICE SMITH, JUSTICE WAINWRIGHT, JUSTICE BRISTER, AND
JUSTICE MEDINA joined.

 

Justice O’Neill
filed an opinion concurring only in the judgment.  

 

 

This is an action for a violation of the
Anti-Retaliation Law, which states in part: “A person may not discharge or in
any other manner discriminate against an employee because the employee has
. . . filed a workers’ compensation claim in good faith . . . .”[1]  As the case comes to us, there are three
principal issues.  First: in charging the
jury on liability, did the trial court err in deviating from the statutory
language?  Second: is there some evidence
to support the jury’s finding of a statutory violation?  Third: is there clear and convincing evidence
to support the jury’s award of punitive damages?  For this last issue, we adopt the rule stated
in In re J.F.C.,[2]
that in reviewing the legal sufficiency of evidence to support a finding that
must be proved by clear and convincing evidence, an appellate court must “look
at all the evidence in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed
a firm belief or conviction that its finding was true.”[3]  By this standard of review, the punitive
damages award here must be reversed.  In
all other respects we affirm the judgment of the court of appeals.[4]

I

David Garza and Luis Hernandez, two Southwestern
Bell Telephone Co. (ASWBT”)
linemen with a long history of friction working together, were hanging cable on
telephone poles in Harlingen on
Thursday morning, October
 20, 1994.  No one else was
present.  Hernandez was working at the
top of the poles from an aerial platform or “bucket” hoisted on the arm of a
truck-mounted hydraulic lift.  Garza was
working on the ground.  At one point,
Hernandez dropped a rope with heavy metal hooks, narrowly missing Garza, who
said nothing.  A few minutes later,
Hernandez lowered the bucket near where Garza had crouched down to cut a strand
of wire used to hold the cable on the poles. 
It is not clear whether the bucket was lowered until it struck Garza in
the head where he was, or whether he stood up and bumped his head on the
bucket.  What is clear is that Garza was
very angry with Hernandez for moving the bucket so close, and hot words were
exchanged.  According to Hernandez, Garza
also threw the strand of wire at him but hit the bucket.

Hernandez immediately left the job site and drove
to the office of their “second-line” supervisor, Ruben Gonzalez, to complain of
Garza’s actions.  Garza tried to call
Rene Robles, the two linemen’s direct, “first-line” supervisor, and then called
Gonzalez, who sent another employee to bring Garza to the office.  Gonzalez took written statements from both
men and then interviewed them separately, asking Diana Vasquez, then vice
president of the local union, to sit in and take notes.  From her notes, it appears that Hernandez
insisted that Garza be fired for threatening violence, but Gonzalez responded
that Hernandez should see the company counselor “and get it off your
chest”.  Vasquez’s notes also reflect
that Garza, in turn, complained that Hernandez was unsafe to work with, and
that while Gonzalez agreed at least Hernandez had acted unsafely that morning,
he stressed that Hernandez’s actions were no excuse for Garza’s threats or
violence.  At one point, according to
Vasquez’s notes, Gonzalez said, “David, all my life I have been fighting
bullies.”  When Garza asked if that meant
Gonzalez thought he was a bully, Gonzalez answered no but added, “[i]f you tell me you are going to kick my butt,” “people can
perceive it as a threat.”  Gonzalez
finished by telling Garza that he and Hernandez could no longer work together
and that he, too, should meet with the company counselor.

Garza did not complain of injury or request
medical treatment until the following Monday, October 24, when he told Robles
he had neck pains.  Robles prepared a
workers’ compensation injury report form and took Garza to a doctor, who
diagnosed muscle spasms and prescribed medication.  The visit and medication cost $640.77, and
Garza required no further medical attention.

SWBT contends
in part that a decision to discipline Garza was made before Monday and thus
could not have been in response to his compensation claim.  The preceding Thursday, the day of the
incident, after Hernandez and Garza had left Gonzalez’s office, Gonzalez and
Robles discussed what had happened.  Both
testified they knew that Garza, although a good worker, had earned a very poor
safety record over the twenty years he had worked for SWBT,
one of the worst Robles had seen among the employees who had worked for
him.  SWBT’s files
showed that Garza had been warned following a motor vehicle accident in 1987
“that his safety record was terrible and that a future accident of any nature,
be it his fault or not, could result in his being taken off the payroll”.  Company files also showed that two years later,
after another motor vehicle accident, Garza had been cautioned again that “if
another problem arises that requires disciplinary action, you will be subject
to termination.”  But Garza’s record did
not reflect an accident of any kind in the prior 27 months, and his 1993
performance appraisal on safety had rated him “satisfactory”.  On July 22, 1994, barely three months earlier, Robles had
written Garza: “You made a commitment to be safe on the job and you did a good
job.  Keep up the good work.”

Nevertheless, at trial Robles testified that on
the day of the incident he recommended to Gonzalez that Garza be disqualified
from driving or working on outside jobs because “[h]e was either going to end
up killing himself or killing his partner or injuring the public.”  Gonzalez testified that he agreed and
telephoned his superior in San Antonio,
Wayne Rider, to report on the day’s events. 
According to Gonzalez’s and Rider’s accounts of their conversation,
Gonzalez told Rider he had had a long-term problem with Garza and was “fed up”
with all of Garza’s problems.  Garza, he
said, should no longer be allowed to drive. 
Although Rider supervised some 500 employees, he knew Garza from his
poor safety record and told Gonzalez to put his recommendation in writing.  Rider instructed Gonzalez to inquire whether
Garza had threatened other employees and to request a manager outside the area
to conduct an impartial investigation of the incident.  But these steps, Rider testified, were “just
kind of like making sure, dotting the i’s and
crossing the t’s, so to speak.”  The decision to disqualify Garza from driving
or working outside, he said, “was made on basically the 20th” and the next day,
before Garza’s worker’s compensation claim of injury the following Monday, and
“everything that happened after that was just window dressing”.

Rider’s testimony is somewhat at odds with other
evidence.  For one thing, he also
testified that he did not make a final decision for some two weeks.  For another, if a decision was made Thursday,
it was not immediately implemented. After meeting with Gonzalez, Garza was sent
to finish the job he and Hernandez had been working on, assisted by another
employee.  On Friday and Saturday, Robles
continued to assign Garza other outside work because, he later testified, “[m]y
boss [Gonzalez] had not given me any other direction”, despite their
conversation on Thursday. Meanwhile, Hernandez was given work cleaning out
trucks.

Most inconsistent with Rider’s testimony are the
first three written reports of the Thursday incident, none of which reflected
that Garza would or should be disciplined. 
On Tuesday or Wednesday, October 25 or 26, Robles telephoned Rider’s
clerk to provide her information for a standard form “flash report”.  The report she prepared stated that no
investigation committee would be appointed and that the only action proposed to
be taken was “positive discipline”. 
Robles testified that he did not give the clerk this information, but
Rider testified that the clerk would have completed the report as she was told,
so that even if she added anything herself, it would only have been more than,
not contrary to, what Robles told her.

About the same time, Gonzalez prepared his own
report.  The report stated that Gonzalez
had interviewed Garza’s fellow employees as Rider had instructed, and that the
nine who were contacted “stated they have never seen David threaten
anyone.”  Gonzalez’s report concluded:

 

Because there [were] no witnesses to the incident and both
employees have a history of not getting along with each other and submitted conflicting
stories, it is impossible to substantiate the exact events of this incident.

 

As a result of my investigation, I feel that both employees
contributed to this confrontation and both of them should be placed on a step
of positive discipline for effectiveness [with] others and be reminded that
they must learn to work with each other in the future.

 

Gonzalez’s report, it should be noted, was entirely consistent
with the “flash report”, including the parts Robles disavowed, and inconsistent
with the decision the two claimed to have reached the day of the accident C to disqualify Garza from driving or
outdoor work.

Contrary to one statement in the “flash report”,
Gonzalez did ask another manager to form a committee to investigate the
incident, again as Rider had instructed. 
The committee of five made its report on October 27.  The exact cause of the accident, they found,
could not be determined because Garza and Hernandez were the only witnesses,
both were reasonably credible, and their accounts differed.  The committee found that both had acted
unsafely, faulting Garza for continuing to work beneath the bucket after almost
being hit by the rope Hernandez dropped and for not pointing out to Hernandez
that he’d dropped it.  The committee
concluded that both employees should have communicated better and been more
careful working with the aerial bucket. 
The committee’s only recommendations were that both employees receive
further training in safety procedures and guidance in communication with
others.

The first hint in SWBT’s records
that Garza would be more severely disciplined came in notations Rider added to
Gonzalez’s “flash report” several days after Garza’s compensation claim.  In the space where the report asked whether
an investigation committee would be appointed, he bracketed the typewritten
“no” and wrote, “yes”.  Where the report
called for an explanation of action to be taken, Rider wrote: “accident will be
investigated, and if employee contributed to the cause of the accident,
disciplinary action will be initiated.” 
He then struck out all but the first four words and added instead:
“Disciplinary action will be administered after investigation”.

On November 7, Gonzalez sent Rider a report far
different from his report ten days earlier. 
It began:

 

This is David’s tenth recorded accident.  The Investigating Committee found fault with
both participants, but could not determine the exact cause because of the
different versions the employees gave. 
Irregardless of the discrepancies, the accident did occur and David was
hurt.  We can no longer tolerate or
should accept this kind of disregard towards safety by an employee.

 

The memorandum cited ten accidents in which Garza had been
involved C five
involving motor vehicles (1979: rear-ended a vehicle; 1980: was struck by a
vehicle that failed to yield; 1986: backed into a vehicle; 1989: hit a fire
hydrant; 1992: pole on trailer hit windshield of an occupied vehicle), and five
requiring medical treatment (1978: stepped on a nail; 1979: strained shoulder lifting
a manhole cover; 1981: slipped and fell in mud, spraining right knee; 1982:
slid down a pole and got splinters in his chest; 1994: the incident with
Hernandez).  The report also listed eight
other “miscellaneous occurrences” of unsafe conduct, from dropping a piece of
cable on a parked car to allowing his foot to slip off the clutch of his
truck.  The report made no attempt to
assess the seriousness of the accidents or the degree to which Garza had been
at fault in any of them.  It noted that
his performance rating for safety had been “unsatisfactory” for five out of the
twenty years Garza had been employed by SWBT
without noting his ratings for the other fifteen years.  It listed four instances of disciplinary
action, all minor C one
suspension for several hours, and three reminders to be more careful.  The report then concluded:

 

While this accident did not cause major harm or damage, it is
another indicator of David’s unconcern towards safety and a warning of further accidents
which could cause greater harm or damage. 
David will not admit to having a safety problem regardless of all the
accidents and incidents, because to David, it is always the other person’s
fault.  He will never change his unsafe
behavior.

 

The company has given David many chances over the years to
change his behavior.  Positive
discipline, training and numerous sessions between management and the local
union to help him have not been successful. 
We have no other alternative but to take David off his present
assignment.  I recommend we give him 90
days to find an inside job with the company and be removed from his present job
assignment.  David is a hard worker and
deserves the opportunity.

 

Rider approved Gonzalez’s November 7 report the
same day.  When Gonzalez was asked at
trial to explain why he had changed positions so drastically from his first
report some ten days earlier, he cited only the committee investigation and
Garza’s safety record.  But the committee
investigation had concluded that fault could not be determined and therefore
did not recommend serious discipline, and Gonzalez testified that he was well
aware of Garza’s safety record before October 20, the day of the accident.  The record simply does not explain why
Gonzalez changed positions.  Gonzalez’s
explanations at trial for not recommending that Hernandez be disciplined were
that his safety record was not as bad as Garza’s, and that shortly after the
accident he was no longer under Gonzalez’s supervision, although neither was
Garza.

Amidst these events, and unrelated to them,
Garza’s and Hernandez’s jobs at SWBT’s Brownsville
office were declared to be “surplus” and transferred to Harlingen.  SWBT vice
president and general manager, J. W. Galloway, stated in an October 26 memo
announcing the decision that both men would be given the opportunity to work
out of Harlingen.  Nothing in the record reflects that Galloway
was aware of Garza’s October 20 accident or October 24 medical treatment.  On November 7, the same day Rider approved Gonzalez’s
second report, Garza applied for a transfer. 
The following day, Gonzalez and Robles met with Garza to tell him that
because of his safety record and the October 20 accident, he could no longer
work as a lineman or drive a company vehicle. 
But the very next day, Robles signed off on Garza’s transfer
application, giving him a job performance rating of “satisfactory” for
safety.  Robles testified that he simply
copied the ratings from Garza’s last job performance review some months
earlier.

SWBT’s written policies regarding driving and safety did not
require the discipline imposed on Garza (although neither did they forbid it),
and the local union lodged a grievance. 
A meeting was convened on November 14 to determine whether Garza’s
October 20 injury was his own fault. 
Dennis Dobbs, the local union president, and Vasquez, its vice
president, attended the hearing along with Garza, Gonzalez, and Robles.  Vasquez and Dobbs took notes.  At trial five years later, Vasquez (who by
then had left the union for a SWBT
management position) testified from her notes that Gonzalez had told Garza “the
fact that he had gone to the doctor” had “caused this investigation and this
action to take place”.  Gonzalez
testified that he did not recall making the statement, but that if he did, he
meant only that absent a request for medical treatment, the accident would not
have been “reportable” and would not have resulted in an investigation,
discipline, and the consequent union complaint. 
Gonzalez provided copies of the reports that had been generated after
the October 20 accident, and the meeting was recessed to give Garza and the
union representatives time to review them.

The meeting reconvened November 30, this time with
Rider and Robles present, along with Garza, Dobbs, and Vasquez.  Dobbs and Vasquez again took notes.  At trial, Vasquez testified as follows:

 

Q: What do you recall
happening that surprised you?

 

A: The fact that David was
told he was the best employee they had ever had and that if it hadn’t been for
him going to the doctor he wouldn’t be sitting there with him being in this
position of getting a non-driving job.

 

Q: Have you ever heard
management ever say anything like that before?

 

A: No.

 

Q: What C how did
you feel about that?

 

A: I was in shock.  It was a real surprise to me.

 

Vasquez could not recall for certain who made the statement,
although she believed it was Rider. 
Dobbs, who remembered the same statement, testified that it was made by
Rider.

On December 28, Garza, Dobbs, and Vasquez met with
SWBT’s human resources director, whose job it was to review
grievances.  Again according to Vasquez’s
notes, Dobbs began by recounting the circumstances leading to Garza’s
discipline and specifically stated that Rider had said earlier, “if David would
not hv gone to Dr nothing would have been done.”  Rider testified at trial that he did not make
the statement Vasquez and Dobbs attributed to him but instead said, as
reflected in Dobbs’s notes, that “[w]hat caused [10/20] to be a reportable
accident is that DG went to the Dr, recvd a
prescription for meds and had the Rx filled.” 
This statement, Rider explained, was true; OSHA regulations made such an
accident “reportable”.  But, he
contended, his statement was not intended to, and did not, say that the reason
Garza was being disciplined was because he had sought medical treatment.

Garza was willing to work out of Harlingen
or any other Valley locale, but after November 8 he was disqualified from
working as a lineman.  SWBT
at first gave him until December 30 to find an inside job with SWBT
or face termination, and later it extended the deadline to
January 31.  In the meantime, Garza
was assigned work around the Brownsville
office stocking materials in the yard and storeroom, work he regarded as
demeaning and “janitorial”.  The work did
not include things like mopping and cleaning, which SWBT
contracted with others to do.  Garza was
also allowed to spend much of his workday studying in the library to qualify
for other company positions.  He tested
for other jobs but did not qualify.  He
was offered a job in San Antonio at
less pay, but he was not willing to move away from the Valley because his wife
could not leave her job and his ailing father lived with them.  Finally, on January 31, Garza was
terminated.

After Garza left SWBT,
Rider encouraged him to continue to do lineman work for SWBT
as an independent contractor and even offered to help him secure a small
business loan to go into business for himself. 
Garza did take other jobs as a lineman and contractor, often working for
SWBT, sometimes doing much of the same work
he had before.

In July 1996, Garza sued SWBT.  Three years later, the case was tried before
a jury, which found that SWBT C

 

disqualif[ied] or discharge[d] David Garza
from his Outside Plant Technician (OSPT) position because he instituted or
caused to be instituted a worker’s compensation claim in good faith.

 

The jury was instructed in this regard that:

 

There may be more than one
cause for an employment decision.  An
employer does not disqualify or discharge an employee for instituting or
causing to be instituted a worker’s compensation claim in good faith, if the
employer would have disqualified or discharged him when it did even if the
employee had not instituted or caused to be instituted a worker’s compensation
claim in good faith.

 

The jury found actual damages totaling $1,034,108[5]
and assessed exemplary damages of $1,000,000. 
The trial court rendered judgment against SWBT
on the verdict, plus prejudgment interest, for $2,170,841.64.  The court of appeals affirmed.[6]

We granted SWBT’s petition for review.[7]  SWBT
complains of error in the jury charge and of the legal sufficiency of evidence
to support liability, and alternatively, the award of exemplary damages.  We examine each in turn.

II

We begin with the jury charge.  As we noted at the outset, the
Anti-Retaliation Law states:

 

A person may not discharge or in any other manner discriminate
against an employee because the employee has . . . filed a workers’
compensation claim in good faith . . . .[8]

 

The trial court inquired of the jury:

 

Did [SWBT] disqualify
or discharge David Garza from his Outside Plant Technician (OSPT) position
because he instituted or caused to be instituted a worker’s compensation claim
in good faith?

 

(Emphasis added.)  SWBT
argues, for three reasons, that the trial court’s substitution of “disqualify”
for “discriminate” was harmful error.

First, SWBT
argues that it was entitled to have the question of its statutory liability
submitted in the words of the statute.  SWBT
is correct that, as a rule, “[w]hen liability is asserted based upon a
provision of a statute or regulation, a jury charge should track the language
of the provision as closely as possible.”[9]  Certainly, “disqualify” and “discriminate”
are not synonyms.  But Garza responds
that the charge merely specified the nature of the alleged discrimination, as
encouraged by the Texas Pattern Jury Charges, which suggests the
following question in this type of case:

 

Did Don Davis [discharge
or (describe other discriminatory action)] Paul Payne because he
[filed a worker’s compensation claim in good faith . . .]?[10]

 

SWBT reads this suggestion not
to dispense with the statutory language but only to focus it, such as by a
question like this:

 

Did Don Davis discriminate
against Paul Payne by reassigning him to a lower-paying job
classification because he filed a worker’s compensation claim in good faith?

 

On the other hand, SWBT
argues, if this reading is incorrect and the pattern jury question does allow
omission of the statutory language, then it is improper.  While it may be useful to draw the jury’s
attention to the particular misconduct alleged in the case, SWBT
continues, to omit the operative statutory words is to deprive the jury of the
legal lens through which the misconduct must be viewed, as by asking a jury
only whether the defendant turned right instead of whether turning right, if it
happened, was negligent.  Discrimination
means treating similarly situated persons differently; to determine whether it
has occurred requires a comparison between the plaintiff and others like
him.  To determine whether
disqualification has occurred requires no such comparison.  In essence, SWBT
argues, the trial court incorrectly equated disqualification with
discrimination.  Garza answers that in
this case, at least, there was no difference between asking the jury whether he
was disqualified for filing a compensation claim and asking whether he was
discriminated against by being disqualified for filing a compensation claim.

We agree with Garza.  His disqualification was unquestionably
disciplinary, and if it was imposed because Garza filed a compensation claim,
as the jury found, and not because of the October 20 accident and Garza’s
safety record, as SWBT contended, then it
clearly violated the Anti-Retaliation Law. 
The jury charge would have been more accurate had it asked whether SWBT
discriminated against Garza for filing a compensation claim by disqualifying
him from his position, retaining the statutory term while focusing on Garza’s
claim, but we do not think it reasonable to conclude that the jury was in any
important way confused by the question it was asked.

Next, SWBT
argues that Garza pleaded only unlawful discharge, not discrimination.  Garza pleaded that SWBT
“embarked upon a plan to terminate his employment” and that he suffered damages
as a “consequence of the unlawful termination” or “retaliatory discharge”.  SWBT
contends that Garza recognized the deficiency in his pleadings by moving, after
the verdict, to amend his pleadings to allege discrimination.  But Garza also pleaded that “[i]n retaliation for filing” a compensation claim, he was
“ordered to find a non-driving position” and was thereby “effectively
disqualified from his job”.  He sought
damages for “retaliatory discharge under the Texas Workers’ Compensation Act
and wrongful conduct” of SWBT.  While Garza’s pleadings did not use the word
“discrimination”, they were nevertheless sufficient to raise that charge if
they gave fair notice of the facts on which Garza based his action sufficient
to allow SWBT to anticipate what evidence
would be relevant and to prepare its defense.[11]  We think Garza’s pleadings clearly met this
standard.  Had SWBT
been in doubt about Garza’s claims, it could have sought clarification through
special exceptions.  It did not do so.

Finally, SWBT
argues that nearly half of the damages Garza recovered C
for past and future lost earnings and benefits C
resulted not from any discrimination against him but from his termination.  SWBT
contends that Garza’s discharge resulted from the “surplus” determination
unrelated to his accident and compensation claim.  But the “surplus” determination expressly
contemplated that Garza could transfer to Harlingen
and work at the same position.  What kept
him from doing so was his disqualification. 
SWBT’s argument simply rejects Garza’s assertion that because
he filed a compensation claim, he was disqualified from his position and could
not find another.  Having agreed with
Garza, the jury could find that the lost earnings and benefits resulted from
his disqualification.

Accordingly, we reject SWBT’s
complaint of reversible error in the jury charge.

III

SWBT
next complains that there was no evidence to support the jury’s finding of
liability.  Rather, SWBT
contends, the evidence establishes that it would have disciplined Garza as it
did even if he had not filed a compensation claim.

SWBT has
essentially two arguments.  One is that
the decision to discipline Garza was made on Thursday, the day of the accident,
or perhaps the next day, but in any event before his compensation claim the
following Monday.  But as recited above, SWBT’s own
records can fairly be read to the contrary. 
For example, Gonzalez, who was involved in the decision to disqualify
Garza, recommended in a written report a day or two after the compensation
claim that Garza be given only “positive discipline”.  SWBT’s other argument is that it disqualified Garza because of
his extraordinarily poor safety record, having specifically warned him in the
past that such action might be necessary. 
Again, there is evidence in SWBT’s records to the contrary. 
For example, in the report just mentioned, made after the compensation
claim, Gonzalez did not cite Garza’s safety record as a basis for discipline
even though Gonzalez testified he knew of Garza’s safety record the day of the
accident.  Rather, he concluded that
discipline should be limited because Garza’s fault in the Thursday accident
could not be determined.  Not until his
report a week later did Gonzalez cite Garza’s poor safety record as a basis for
severe discipline.

SWBT notes that
there is no evidence that it discouraged compensation claims, but there is
evidence that it disciplined Garza, who made a claim, more severely than it
disciplined Hernandez, who did not.  SWBT
explains that Hernandez’s safety record was better than Garza’s, but the jury
was not required to accept that explanation. 
SWBT acknowledges that its written
safety policies did not require Garza’s disqualification, but neither, it
points out, did those policies preclude disqualification.  Again, SWBT’s position for going beyond its written policies is not
one the jury was required to accept. 
Vasquez, the union vice president who had moved to management by the
time of trial, testified that she was shocked and surprised by a statement made
during the grievance meetings by one of Garza’s superiors that seemed to
connect his discipline with his compensation claim.  Dobbs, the union president, supported
Vasquez’s testimony.  SWBT
argues that it was Garza’s injury, not his claim, that precipitated the
investigations and disciplinary decision, but the jury was free to believe
Vasquez and Dobbs.  The jury might also
have discounted SWBT’s professed concerns for Garza’s carelessness when it
heard Rider testify that he encouraged Garza to continue doing the same work
for SWBT after his termination, as a private
contractor.

From this and the other evidence we have detailed
above, we have little difficulty rejecting SWBT’s argument that the jury’s liability finding lacks support
in the record.

IV

Finally, SWBT
argues that there was no evidence to support the jury’s finding of actual
malice as a predicate to an award of punitive damages.  The jury was asked and instructed as follows:

 

Do you find by clear and
convincing evidence that the harm to David Garza resulted from actual malice on
the part of [SWBT]?

 

AClear
and convincing evidence” means the measure or degree of proof that produces a
firm belief or conviction of the truth of the allegations sought to be
established.

 

AActual
malice” means ill will, spite, evil motive, or purpose to injure another.

 

Neither SWBT nor Garza
objected to this question or these instructions.  Both concede that proof of actual malice was
required to recover punitive damages for a violation of the Anti-Retaliation
Law,[12]
that actual malice was correctly defined,[13]
that proof was required to be by clear and convincing evidence,[14]
and that “clear and convincing evidence was correctly defined”.[15]  In assessing the evidence, we assume that the
portions of the charge just quoted, because they were given without objection,
correctly state the law.[16]

A

We must first determine the standard of review.  The question is whether an elevated standard
of proof at trial C here,
clear and convincing evidence C
requires a correspondingly elevated standard of evidentiary review on
appeal.  More specifically: will anything
more than a scintilla of probative evidence C
evidence “that would enable reasonable and fair-minded people to differ in
their conclusions” C support
a verdict of actual malice, as it would if proof at trial were by a
preponderance of the evidence,[17]
or must there be more C
must there be some evidence that produces a firm belief or conviction of the
truth of the allegation, since that was the “clear and convincing” standard of
proof the jury was required to apply? 
The court of appeals did not discuss the issue and applied the ordinary
standard of review.[18]  SWBT
argues that an elevated standard must be applied.  Garza’s position is not clear.

The question must be answered in the context of
the distinction, perhaps more deeply engrained in Texas
law than in that of any other jurisdiction, between no evidence and
insufficient evidence.[19]  The hardiness of this distinction in our
jurisprudence, if not its very existence, derives from a clause included in the
1891 amendments to Article V of the Texas Constitution,[20]
amendments that gave the Texas
judiciary its present structure.[21]  Section 6 created courts of civil appeals and
provided that “the decision of said courts shall be conclusive on all questions
of fact brought before them on appeal or error.”[22]  History provides no clear indication of the
framers’ purpose in including this “factual conclusivity
clause” or the ratifiers’ purpose in adopting it.[23]  Since one overall purpose of the amendments
was to reduce this Court’s workload, the clause may have been intended to help
achieve that end, merely as a practical matter.[24]  More philosophically, it has been suggested
that in restructuring the judiciary, the framers may have come to believe that
one appeal regarding case-specific factual issues was enough, while a second
appeal regarding generally applicable legal issues was necessary to assure
uniform development of the law throughout the State.[25]  Whatever its purpose, the clause was not a
conveyance of new authority to appellate courts.  The year before the amendments were adopted,
this Court had asserted:

 

Although this court has the power to review a case upon the
facts, and to set aside a verdict which has evidence to support it, that power
has been reluctantly exercised.  But it
is the right and duty of the court to set aside a verdict, when it is against
such a preponderance of the evidence, that it is clearly wrong.”[26]

 

Rather, the “factual conclusivity
clause” confined this one part of the appellate function C determining whether a judgment has sufficient
evidentiary support C
to the courts of civil appeals, now the courts of appeals.[27]  The clause did not affect this Court’s power
to determine whether a judgment has any evidentiary support.  As we explained not long after the amendments
took effect:

 

it is elementary that whether there be any evidence or not to
support an issue is a question of law, and not of fact, and it follows that the
decision of the court of civil appeals upon such a question is subject to
review by this court.[28]

 

Based on this statement, no evidence is sometimes referred to as
being legally insufficient, the issue being one of law, while evidence so
against the preponderance of other evidence that the judgment it supports is
clearly wrong is sometimes referred to as being factually insufficient.  The use of the word “insufficient” in both
contexts has compounded confusion over the distinction.[29]

While the “factual conclusivity
clause” requires that a distinction be made between questions of fact and
questions of law, it does not prescribe where the line is to be drawn, leaving
that matter for this Court.  Over the
years, we have concluded that no evidence means not only a complete absence of
evidence but also evidence which cannot be given legal effect, either because
the law does not permit it or because the evidence is too weak.[30]  To define evidence that is too weak to be
given legal effect, we have adopted the “scintilla” rule.  As Chief Justice Calvert explained in his
seminal article on the subject:

 

The scintilla rule,
although having its origin at a much earlier date, was firmed up in Texas in Joske v. Irvine
[44 S.W. 1059 (Tex. 1898)].  The rule may
be stated in these words: when the evidence offered to prove a vital fact is so
weak as to do no more than create a mere surmise or suspicion of its existence,
the evidence is, in legal effect, no evidence, and will not support a verdict
or judgment.[31]

 

In other words, evidence which does no more than create a mere
surmise or suspicion cannot prove the truth of an allegation.  The rule works in tandem with the
preponderance-of-the-evidence standard of proof: any evidence that does not
merely create surmise or suspicion can be used to show that something is more
likely than not.  But when proof of an
allegation must be clear and convincing, even evidence that does more than
raise surmise and suspicion will not suffice unless it is capable of producing
a firm belief or conviction that the allegation is true.  Evidence of lesser quality is, in legal effect,
no evidence.  Whether evidence is of such
quality is thus a question of law in a case with that elevated standard of
proof, just as whether evidence is more than a scintilla is a question of law
in a case proved by a preponderance of the evidence.

In reviewing a finding that must be proved by
clear and convincing evidence, it makes no sense for an appellate court to
determine whether the supporting evidence amounts to more than a
scintilla.  Even if it does, the finding
is invalid unless the evidence is also clear and convincing.  In such a case, the review required by the
“scintilla” rule is wholly irrelevant and thus, no review at all.  Thus, as a matter of logic, a finding that
must meet an elevated standard of proof must also meet an elevated standard of
review.

We reached essentially the same conclusion in In re C.H.[32]
and In re J.F.C.,[33]
two cases involving the termination of parental rights.  Because “[t]he natural right which exists
between parents and their children is one of constitutional dimensions”,[34]
we had previously held that it could be terminated only on clear and convincing
evidence,[35]
and shortly afterward the United States Supreme Court[36]
and the Texas Legislature[37]
reached the same conclusion.  The issues
in C.H. and J.F.C. were whether the higher proof standard
necessitated higher standards of factual sufficiency and legal sufficiency
review, respectively.  In J.F.C.
we explained:

 

We held in In re C.H.
“that the appellate standard for reviewing termination findings is whether the
evidence is such that a factfinder could reasonably
form a firm belief or conviction about the truth of the State’s
allegations.”  We expressly “reject[ed]
standards that retain the traditional factual sufficiency standard while
attempting to accommodate the clear‑and‑convincing burden of
proof.”  We concluded that “the burden of
proof at trial necessarily affects appellate review of the evidence.”  We explained:

 

Under traditional factual
sufficiency standards, a court determines if a finding is so against the great
weight and preponderance of the evidence that it is manifestly unjust, shocks
the conscience, or clearly demonstrates bias. 
But that standard is inadequate when evidence is more than a
preponderance (more likely than not) but is not clear and convincing.  As a matter of logic, a finding that must be
based on clear and convincing evidence cannot be viewed on appeal the same as
one that may be sustained on a mere preponderance.

 

The same logic dictates
the conclusion that our traditional legal sufficiency standard, which upholds a
finding supported by “[a]nything more than a
scintilla of evidence,” is inadequate when the United States Constitution
requires proof by clear and convincing evidence.  Requiring only “[a]nything
more than” a mere scintilla of evidence does not equate to clear and convincing
evidence.[38]

 

Although the parental interest at issue was of constitutional
magnitude, and the standard of proof constitutionally prescribed, we did not
decide whether an elevated standard of review was likewise constitutionally
mandated but applied it purely as a “matter of logic”.

Similarly, the United States Supreme Court has
held in other contexts that when the standard of proof at trial is
constitutionally required to be more exacting, the standard of review on appeal
must be more exacting as well.  In Jackson
v. Virginia, for example, the Court considered “what standard is to be
applied in a federal habeas corpus proceeding when the claim is made that a
person has been convicted in a state court upon insufficient evidence.”[39]  Noting that “the Due Process Clause of the
Fourteenth Amendment protects a defendant in a criminal case against conviction
‘except upon proof beyond a reasonable doubt’”[40]
the Court concluded that this right could not adequately be protected by jury
instructions alone;[41]
evidentiary review was essential.[42]  Nor would the ordinary standard of review
suffice:

 

A[A] mere
modicum of evidence may satisfy a ‘no evidence’ standard . . . .”  Any evidence that is relevant C that has
any tendency to make the existence of an element of a crime slightly more
probable than it would be without the evidence C could be deemed a “mere modicum.”  But it could not seriously be argued that
such a “modicum” of evidence could by itself rationally support a conviction
beyond a reasonable doubt.[43]

 

The elevated proof requirement necessitated a more exacting
standard of review:

 

the critical inquiry on review of the sufficiency of the
evidence to support a criminal conviction must be not simply to determine
whether the jury was properly instructed, but to determine whether the record
evidence could reasonably support a finding of guilt beyond a reasonable doubt.[44]

 

Texas courts use this same standard.[45]  We relied on Jackson in J.F.C.:

 

The reasoning in Jackson
reinforces our conclusion that to apply our traditional no evidence standard of
review in a parental termination case would not afford the protections inherent
in the clear and convincing standard of proof. 
As the example in Jackson highlights, a parent’s rights could be
terminated based on “but one slender bit of evidence” as long as the jury was
properly instructed on the clear and convincing evidence burden of proof.  Our legal sufficiency review, therefore, must
take into consideration whether the evidence is such that a factfinder
could reasonably form a firm belief or conviction about the truth of the matter
on which the State bears the burden of proof.[46]

 

Likewise, the Supreme Court held in New York
Times Co. v. Sullivan that when proof of actual malice is required in
defamation cases, evidence of “convincing clarity” is required.[47]  Further, appellate courts cannot use ordinary
standards of review but “must ‘make an independent examination of the whole
record,’ so as to assure [itself] that the judgment does not constitute a
forbidden intrusion on the field of free expression.”[48]  Texas law adheres, of course, to both
requirements.[49]

In Jackson and in Sullivan, as in J.F.C.
and C.H., the elevated standard of evidentiary review on appeal was not itself
an independent constitutional guarantee but was instead a necessary concomitant
to a constitutional right to proof by more than a preponderance of the
evidence.  Whatever the source of a right
to an elevated standard of proof, whether by constitutional provision, by
federal[50]
or state [51]
statute, or by court decision,[52]
the problem of evidentiary review on appeal is the same: a finding that cannot
be made on evidence of lesser quality should not be affirmed on such evidence.

Three objections, primarily, are raised to the use
of an elevated standard of evidentiary review on appeal.  None, we think, has merit.  The first is that such a standard invites the
appellate court to weigh evidence and resolve issues of credibility, thus
invading the province of the jury.  But
the required weighing of evidence is neither more nor different than that
involved in an ordinary factual sufficiency review; the only difference is that
a higher quality of evidence is necessary to tip the scales.  Issues of credibility that depend on
appearance and demeanor cannot be weighed by the appellate court; the witnesses
are not present.  And even when
credibility issues are reflected in the written transcript, the appellate court
must defer to the jury’s determinations, at least so long as those
determinations are not themselves unreasonable. 
For example, the Supreme Court explained in Jackson that an
elevated standard of review C

 

does not require a court to “ask itself whether it
believes that the evidence at the trial established guilt beyond a reasonable
doubt.”  Instead, the relevant question
is whether, after viewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the
responsibility of the trier of fact fairly to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. Once a defendant has been found
guilty of the crime charged, the factfinder’s role as
weigher of the evidence is preserved through a legal
conclusion that upon judicial review all of the evidence is to be
considered in the light most favorable to the prosecution.  The criterion thus impinges upon “jury”
discretion only to the extent necessary to guarantee the fundamental protection
of due process of law.[53]

 

Similarly, we held in J.F.C. and C.H. that an
appellate court must assume that the jury resolved evidentiary conflicts in
favor of its verdict if it reasonably could have done so.[54]

The second objection is that an elevated
no-evidence review standard is unnecessary because the appellate court can
assure adherence to the proof standard through a review of the sufficiency of
the evidence.  Indeed, this Court has
occasionally said that “[t]he requirement of clear and convincing evidence is
merely another method of stating that a cause of action must be supported by
factually sufficient evidence”,[55]
although we have not said this in a case in which clear and convincing was a
requirement for proof at trial.[56]
The requirement that a jury use a heightened standard of proof is a relatively
recent phenomenon.[57]  An insufficiency review cannot substitute for
a no-evidence review because the consequences are different.  As a rule, if a party with the burden of
proof offers no evidence on an issue, the opposing party is entitled to
judgment.[58]  If, however, there is some evidence to prove
an issue but that evidence is factually insufficient, the only remedy is a new
trial.[59]  To police adherence to an elevated proof
standard solely through insufficiency review is to deny the remedy of rendition
to those whose interests deserve increased protection.  This, of course, makes no sense.

Finally, even if Texas courts of appeals must use
an elevated standard of no-evidence review, objection is made to this Court’s
authority to do so, based on the “factual conclusivity
clause” of the Texas Constitution with which we began this discussion.  But as we have explained, the “factual conclusivity clause” does not define the “questions of
fact” on which the courts of appeals’ decisions are conclusive.  We held, shortly after the clause was
adopted, that “whether there be any evidence or not to support an issue is a
question of law, and not of fact”.[60]  Evidence that does not produce a firm belief
or conviction does not support an issue that must be proved by clear and
convincing evidence.  Whether evidence
supports an issue is no less a question of law simply because the standard of
proof is heightened.  We essentially
reached this conclusion in defamation cases requiring proof of actual
malice.  The Supreme Court has stated
that “[t]he question whether the evidence in the record in a defamation case is
sufficient to support a finding of actual malice is a question of law.”[61]  We have agreed and treated the question as
such,[62]
although we might have concluded for purposes of the “factual conclusivity clause” that the question was one of fact
exclusively for the courts of appeals. 
Such a conclusion would not have contradicted the Supreme Court but
would simply have assigned its required evidentiary review solely to our courts
of appeals.  By undertaking the review
ourselves, we in effect determined that the required evidentiary review was
within our jurisdiction.

In sum, we think that whenever the standard of
proof at trial is elevated, the standard of appellate review must likewise be
elevated.  Because the “clear and
convincing” standard of proof in this case is the same as in J.F.C., we
follow the procedure outlined there for conducting a no-evidence review:

 

In a legal sufficiency review, a court should look at all the
evidence in the light most favorable to the finding to determine whether a
reasonable trier of fact could have formed a firm
belief or conviction that its finding was true. 
To give appropriate deference to the factfinder’s
conclusions and the role of a court conducting a legal sufficiency review,
looking at the evidence in the light most favorable to the judgment means that
a reviewing court must assume that the factfinder
resolved disputed facts in favor of its finding if a reasonable factfinder could do so. 
A corollary to this requirement is that a court should disregard all
evidence that a reasonable factfinder could have
disbelieved or found to have been incredible. 
This does not mean that a court must disregard all evidence that does
not support the finding.  Disregarding
undisputed facts that do not support the finding could skew the analysis of
whether there is clear and convincing evidence.

 

If, after conducting its
legal sufficiency review of the record evidence, a court determines that no
reasonable factfinder could form a firm belief or
conviction that the matter that must be proven is true, then that court must
conclude that the evidence is legally insufficient.[63]

 

We need not consider here whether a different procedure for
review (as opposed to the standard of review) of an award of punitive
damages is required by the United States Supreme Court’s recent decision in Cooper
Industries, Inc. v. Leatherman Tool Group.[64]

B

            We
now turn to the evidence of actual malice C
that is, ill will, spite, evil motive, or purposeful injury.  Garza complains mostly of Gonzalez and
Rider.  SWBT
argues that neither was proved to be a vice-principal whose conduct can be
attributed to SWBT for the purpose of
awarding exemplary damages.  We need not
reach this argument and assume for purposes of our analysis that Gonzalez and
Rider were vice principals.

Garza points to the following evidence:

$          Gonzalez
C
implied Garza was a bully; told Rider he had long-term problems with Garza and
was “fed up” while allowing Garza to return to outside work; went out of his
way to see that Garza was punished, even after Garza was no longer under his
supervision; distorted Garza’s safety record, blowing small incidents out of
proportion, even though Garza continued to be rated as satisfactory on safety
two days after discipline was imposed; gave Rider a second report that was a
diatribe against Garza;

 

$          Rider
C
admitted he was personally familiar with Garza, although he had some 500
employees under his supervision, and pressed for having Garza disciplined
without a determination that Garza was at fault in the accident with Hernandez;
severely disciplined Garza while calling him one of SWBT’s
best linemen; faulted Garza’s safety record as a lineman but offered Garza the
same work as an independent contractor;

 

$          the
discipline imposed on Garza was not required by SWBT
policies;

 

$          the
union meetings following Garza’s discipline were a sham, or as Rider put it,
“window dressing”;

 

$          after
discipline was imposed, Garza was assigned demeaning work, humiliating him in
front of his co-workers;

 

$          Hernandez was not disciplined.

With this evidence, however, we must also consider
other evidence that was undisputed. 
Garza unquestionably had a lengthy record of safety violations and had
been strictly warned twice before the October 20 accident that he could be
terminated for any further mishap, irrespective of fault.  SWBT’s investigation of the accident, which included a thorough
and impartial inquiry by a committee headed by an outside manager, resulted in
differences of opinion.  Although not
required by SWBT policies, the discipline
imposed on Garza was not prohibited and was consistent with the warnings he had
previously received.  The meetings with
union officials were at their behest, and SWBT
employees merely attended as requested.  SWBT
gave Garza two months at first, and then an additonal
month, to relocate within the company, offering him the opportunity to use work
time to study in order to qualify for other positions.  While Garza considered the shopwork to which he was assigned during that period
demeaning, it was not janitorial in the sense that it did not involve mopping
and cleaning.  And Hernandez’s safety
record was not as poor as Garza’s.

Viewing all of this evidence C as well as the evidence we have
detailed earlier along with the entire record C
in the light most favorable to the verdict, we cannot conclude that a
reasonable trier of fact could form a firm belief or
conviction that SWBT acted toward Garza with
ill will, spite, evil motive, or purposeful injury.  While there are some indications that it
might have done so, there are a great many others that it did not.  At most, the record reflects that SWBT
mishandled the situation; it does not produce a reasonable conviction that SWBT
intended to punish Garza without cause.

Therefore, we conclude that there is no clear and
convincing evidence of actual malice to support an award of punitive damages.

C

The concurring opinion agrees that
an elevated standard of review must be applied, agrees that no evidence of
actual malice meets that standard, and then castigates the Court for
“impermissibly weigh[ing] conflicting evidence”.[65]  The opinion gives only two examples.

First, the concurring opinion states that “the
jury could reasonably have inferred that Garza’s record was not as poor as SWBT
suggested”, implying that we disagree.[66]  We do not. 
We absolutely agree.  But while
our review must acknowledge reasonable inferences that may have been drawn by
the jury, it cannot, under the procedures set out in J.F.C., disregard
undisputed evidence.  It is undisputed C not merely unchallenged, but
undisputed C that
Garza’s safety record was accurately reflected in his personnel file.  Garza conceded at trial that every incident
for which he was cited actually occurred, and that on most occasions he was at
fault.  He vigorously disputes that his
safety record justified, or was the actual reason for, the discipline he was
given, and the jury was certainly entitled to believe him.  The standard of review requires us to credit
the jury’s reasonable inference, but it does not allow us to disregard the
undisputed fact that Garza’s record of safety violations was lengthy.

Next, the concurring opinion states that we
“suggest[] that SWBT actually aided Garza by
conducting a ‘thorough and impartial’ investigation.”[67]  We suggest no such thing.  We say only, as the concurring opinion does,
that “[s]ome parts of the investigation may indeed
have been impartial, and may even have favored Garza.”[68]  We agree with the concurring opinion that the
jury may have believed that the investigation, as a whole, was not thorough and
impartial.  Again, however, the standard
of review requires that we credit evidence the jury could have believed without
disregarding undisputed evidence.

We agree with the concurring opinion that the jury
could have believed: that SWBT overstated
the significance of Garza’s safety record, that the investigation was in large
part unfair, that Garza’s discipline was inconsistent with SWBT’s written
policies, and that SWBT was insincere in
helping Garza qualify for other jobs with the company.  But in determining whether there was any
clear and convincing evidence that SWBT
acted with actual malice, we must also consider the undisputed evidence that
Garza had a lengthy record of safety violations, overstated or not, that part
of the investigation was impartial and tended to exonerate Garza, that no
written company policy forbade the discipline Garza was given, and that Garza
was given the time and opportunity to qualify for another job, of which he has
never complained.  This analysis, as we
have explained, is required by the elevated standard of proof and does not
transgress constitutional limits on our authority.

The concurring opinion cannot point to any
evidence or inference favorable to Garza that we have failed to consider.  Without so much as a single example, the
concurring opinion accuses the Court of decision-making in excess of its
authority, then reaches exactly the same result we do.  Its charges must be viewed in that light.

*          *          *         
*          *

Accordingly, the judgment of the
court of appeals is reversed insofar as it affirms the award of exemplary
damages, and in all other respects is affirmed.

 

                                                                             

Nathan L. Hecht

Justice

Opinion delivered:  December 31, 2004











[1] Tex. Lab. Code § 451.001(1).





[2] 96 S.W.3d 256, 264-268 (Tex. 2002).





[3] Id. at 266.





[4] 58 S.W.3d 214 (Tex. App.CCorpus Christi 2001).





[5] Past lost earnings of $129,538; past lost benefits of
$7,100; future lost earnings of $174,732; future lost benefits of $122,738; past
mental anguish of $300,000; future mental anguish of $300,000.





[6] 58 S.W.3d 214 (Tex. App.CCorpus Christi 2001).





[7] 46 Tex. Sup. Ct. J. 776 (June 12, 2003).





[8] Tex. Lab. Code § 451.001(1) (emphasis added).





[9] Spencer v. Eagle Star Ins. Co. of Am., 876
S.W.2d 154, 157 (Tex. 1994).





[10] Comm. on Pattern Jury Charges,
State Bar of Tex., Texas Pattern Jury Charges C Business, Consumer,
Insurance, Employment PJC 107.5 (2003)
(italics, brackets, and parentheses in original).





[11] See Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 896-897 (Tex. 2000) (ATexas follows a ‘fair notice’ standard for pleading,
which looks to whether the opposing party can ascertain from the pleading the
nature and basic issues of the controversy and what testimony will be relevant.
. . .  ‘A petition is
sufficient if it gives fair and adequate notice of the facts upon which the
pleader bases his claim.  The purpose of
this rule is to give the opposing party information sufficient to enable him to
prepare a defense.’  Roark v. Allen,
633 S.W.2d 804, 810 (Tex. 1982).”).   





[12] Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 452-454,  n.4 (Tex. 1996) (noting that the general
statutory requirement of proof of malice C not the
same as actual malice, required by the Court C as a
predicate to recovery of exemplary damages was expressly inapplicable to
actions brought under the workers’ compensation laws,a
restriction that has since been removed.  
See Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 4.01, 1997
Tex. Gen. Laws 325, 328, adopting amendment contained in Act of April
 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109, and not the
amendment contained in Act of May 27, 1995, 74th Leg., R.S., ch. 260,
§ 9, 1995 Tex. Gen. Laws 2207, 2473, in former Tex. Civ. Prac. & Rem. Code § 41.002(b)(3)).





[13] Id.; cf. Tex. Civ. Prac. & Rem. Code § 41.001(7) (now defining “malice” C as distinct from actual malice C as a predicate for recovery of exemplary damages to
mean “a specific intent by the defendant to cause substantial injury or harm to
the claimant”).





[14] Cf. Act of April 11, 1995, 74th Leg., R.S., ch. 19,
§§ 1-2, 1995 Tex. Gen. Laws 108, 109-110, 113 (adopting and defining
“clear and convincing evidence” standard, now codified as Tex. Civ. Prac. & Rem. Code §§ 41.001(2), 41.003(b); adopting and defining
“malice” standard, now codified as id. §§ 41.001(7), 41.003(a);
removing  inapplicability of chapter 41
to actions under the workers’ compensation laws, formerly codified as id.
§ 41.002(b)(3); and providing: “This Act takes effect September
 1, 1995, and applies only to
a cause of action that accrues on or after that date.  A suit filed before the effective date of
this Act is governed by the law applicable to the claim that existed
immediately before the effective date of this Act, and that law is continued in
effect for that purpose.”); Act of May 27, 1995, 74th Leg., R.S., ch. 260,
§ 9, 1995 Tex. Gen. Laws 2207, 2473 (amending but retaining provision
making chapter 41 inapplicable to actions under the workers’ compensation
laws); Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 4.01, 1997
Tex. Gen. Laws 325, 328 (adopting amendment contained in Act of April
 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109, and not the
later amendment contained in Act of May 27, 1995, 74th Leg., R.S., ch. 260,
§ 9, 1995 Tex. Gen. Laws 2207, 2473).





[15] See State v. Addington,
588 S.W.2d 569, 570 (Tex. 1979) (per curiam)
(defining “clear and convincing evidence” as “that measure or degree of proof
which will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established”, following Addington v. Texas,
441 U.S. 418, 431‑32, (1979)).





[16] Wal-Mart Stores, Inc. v. Sturges,
52 S.W.3d 711, 715 (Tex. 2001) (stating that the sufficiency of the evidence
must be assessed “in light of the jury charge the the
district court gave without objection”)(citing City of Fort Worth v. Zimlich, 29 S.W.3d 62, 71 (Tex. 2000), and Larson v.
Cook Consultants, Inc., 690 S.W.2d 567, 568 (Tex. 1985)); Bradford v.
Vento, 48 S.W.3d 749, 754 (Tex. 2001) (same); Osterberg
v. Peca, 12 S.W.3d 31, 55 (Tex. 2000) (stating that “it is the court’s
charge, not some other unidentified law, that measures the sufficiency of the
evidence when the opposing party fails to object to the charge”).





[17] Transportation Ins. Co. v. Moriel,
879 S.W.2d 10, 25 (Tex. 1994); accord Merrell Dow Pharmaceuticals,
Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997); Burroughs Wellcome
Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995).





[18] 58 S.W.3d at 227 (AIn
reviewing the evidence for legal sufficiency, we consider only the evidence and
inferences, viewed in their most favorable light, which support the jury’s
findings and disregard all evidence and inferences to the contrary.  Anything more than a scintilla of evidence
that is more than a basis for mere surmise or suspicion is legally sufficient
to support the finding.  If the evidence
provides a rational basis for reasonable minds to differ as to the existence of
a vital fact, there is some evidence or more than a scintilla.”  (Citations omitted.)).





[19] See generally W. St. John Garwood, The Question of Insufficient Evidence on Appeal, 30 Tex. L. Rev. 803 (1952); Robert W. Calvert, “No Evidence” and
“Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361 (1960); William Powers, Jr. & Jack Ratliff, Another
Look at “No Evidence” and “Insufficient Evidence”, 69 Tex. L. Rev. 515 (1991).





[20] Tex.
S.J. Res. 16, 22nd Leg, R.S., 1891 Tex. Gen. Laws 197.





[21] See Garwood, supra note 19, 29, at 805
(APrior to the [1891 constitutional amendments] the
distinction seems to have been rarely mentioned.”).





[22] Tex. Const. art. V, § 6.





[23] See Powers & Ratliff, supra note
19, at 540 (AThere is a paucity of evidence about the framers’
precise rationale for giving courts of appeals final authority over questions
of fact”).





[24] See 1
George D. Braden, et al., The Constitution of the State of Texas: An Annotated and Comparative Analysis 399 (1977) (AThe
courts of civil appeals were the major innovation of the 1891 reform
package.  The supreme court was falling
so far behind that either the right to appeal had to be severely curtailed or
the system had to be radically revised. . . .  The theory in creating the courts of civil
appeals apparently was that their decisions would be final in most civil
cases.  The supreme court’s primary
function was to be the resolution of conflicts.”).





[25] See Powers & Ratliff, supra note
19, at 540 (AWhy should we give the supreme court jurisdiction over
questions of law C thereby giving litigants two levels of appeal C but not give it jurisdiction over questions of fact C thereby limiting litigants to only one level of
appeal?  The reason, we suggest, is that
the supreme court needs jurisdiction over questions of law to insure uniformity
throughout the state, uniformity that is not as important on issues of fact
that are specific to a particular case.”).





[26] Missouri Pac. Ry. v. Somers, 14 S.W. 779, 779 (Tex. 1890).





[27] Cropper v. Caterpillar Tractor Co., 754 S.W.2d
646, 648 (Tex. 1988) (stating that the Conclusivity
Clause “functions not as a grant of authority to the courts of appeals but as a
limitation upon the judicial authority of this court.”).





[28] Choate v. San Antonio & A.P. Ry., 44 S.W. 69, 69 (Tex. 1898); see also Muhle
v. New York, T. & M. Ry., 25 S.W. 607, 608 (Tex. 1894) (stating that “whether or not there was
evidence from which the jury might have [made a finding] is a question of law
which we are called upon to determine.”).





[29] See, e.g. Garwood, supra note 19, at
805 (A[T]here still exists a modicum of confusion in the
profession about the difference between the so-called fact question of
‘insufficient’ evidence and the law question of ‘no’ evidence.  Indeed, considering the matter on principle,
it is perhaps surprising that we do not have more confusion than we do; and I
sometimes wonder if there is much logical basis for the distinction.  But . . . it is almost ‘hornbook
law’ in Texas that the distinction is recognized and has important
consequences.”); Calvert, supra note 19, at 359 (AExpressions in points of error such as ‘no evidence,’
‘insufficient evidence,’ ‘no sufficient evidence,’ ‘no legally sufficient
evidence,’ ‘against the great weight of the evidence,’ ‘contrary to the
preponderance of the evidence,’ ad infinitum, have definite connotations in the
mind of an appellate judge, but, except in a very limited way, they are not, or
at least should not be, controlling.”).





[30] See Calvert, supra note 19, at 362-363
(A‘No evidence’ points must, and may only, be sustained
when the record discloses one of the following situations: (a) a complete
absence of evidence of a vital fact; (b) the court is barred by rules of law or
of evidence from giving weight to the only evidence offered to prove a vital
fact; (c) the evidence offered to prove a vital fact is no more than a mere
scintilla; (d) the evidence establishes conclusively the opposite of the vital
fact.”).





[31] Calvert, supra note 19, at 363.





[32] 89 S.W.3d 17 (Tex. 2002).





[33] 96 S.W.3d 256 (Tex. 2002).





[34] Wiley v. Spratlan, 543
S.W.2d 349, 352 (Tex. 1976); accord, Stanley v. Illinois, 405
U.S. 645, 651 (1972) (AThe integrity of the family unit has found protection
in the Due Process Clause of the Fourteenth Amendment, the Equal Protection
Clause of the Fourteenth Amendment, and the Ninth Amendment.”  (Citations omitted.)).





[35] In re G.M., 596 S.W.2d 846, 847 (Tex. 1980).





[36] Santosky v.
Kramer, 455 U.S. 745, 769 (1982).





[37] Act of Act of May 24, 1995, 74th Leg., R.S., ch. 709,
§ 1, 1995 Tex. Gen. Laws 3745, and Act of May 26, 1995, 74th Leg., R.S., ch. 751,
§ 65, 1995 Tex. Gen. Laws 3910-3911, both amending  Tex. Fam. Code § 161.001 (1), as added by Act of April
 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 212 (recodifying former Tex. Fam. Code § 11.15).





[38] 96 S.W.3d at 264-265 (footnotes and citation
omitted).





[39] 443 U.S. 307, 309 (1979).





[40] Id. at 315 (citation omitted).





[41] Id. at 316-317.





[42] Id. at 317-318.





[43] Id. at 320 (citations omitted).





[44] Id. at 318-319.





[45] Wilson v. State, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) (AIn
evaluating legal sufficiency, we must view the evidence in the light most
favorable to the verdict and determine whether any rational trier
of fact could have found the elements of the offense beyond a reasonable
doubt.”).





[46] 96 S.W.3d at 265-266.





[47] 376 U.S. 254, 285-286 (1964).





[48] Id. at 285; accord, Bose Corp. v.
Consumers Union, 466 U.S. 485, 511 (1984) (stating that appellate review
must determine whether the evidence is “sufficient to cross the constitutional
threshold that bars the entry of any judgment that is not supported by clear
and convincing proof of ‘actual malice.’“).





[49] Turner v. KTRK Television, Inc., 38 S.W.3d
103, 119-120 (Tex. 2000)





[50] See, e.g., 20 U.S.C. § 6736(c)(1)
(punitive damages for assault by teacher); 25 U.S.C. § 1912(e) (foster
care for Indian children); 42 U.S.C. § 300aaB22(b)(2)(B)
(liability for vaccine-related injuries); id. § 11603(e)(2)(A)
(remedy for international child abduction); id. § 14503(e) (punitive
damages for act of volunteer for non-profit agencies); 49 U.S.C.
§ 28103(a)(1) (harm caused by rail carrier).





[51] See, e.g., Tex. Civ. Prac. & Rem. Code § 18.033(c) (boundary disputes); id.
§ 41.003(a) (punitive damages); Tex. Fam. Code § 3.003(b)
(separate property); id. § 55.55(c) (commitment of a mentally ill juvenile); id. § 159.401(b)(5)
(temporary child support order); id. § 160.608(d) (denial of motion
for genetic testing); id. § 160.624(a)(5) (temporary child support
order); id. § 161.001 (termination of parent-child relationship); id.
§ 161.003(a)(2) (finding that illness leaves parent unfit to care for
child); id. § 161.206(a) (order terminating parent-child
relationship); Tex. Health & Safety Code §§ 81.169(h), 81.171(a) (hearing on state’s
application for court order for management of a person with a communicable
disease); id. § 81.172(a) (order for temporary management of person
with a communicable disease); id. § 81.173(a) (order for extended
management of person with communicable disease); id. § 81.190(e),
(f) (reexamination of involuntary quarantine); id. §§ 314.002(d),
314.003(d), 314.006(b) (benefits resulting from cooperative hospital
agreement); id. §§ 462.067(d), 462.068(a),462.069(a)(2), 462.075(e)
(court-ordered substance abuse treatment); id. §§ 574.031(g),
574.033(a), 574.034(a) (court-ordered mental health services); id.
§ 574.035(a) (court-ordered extended mental health services); id.
§ 574.069(e) (reexamination of court order for mental health services); id.
§ 574.106(a) (court-ordered administration of psychoactive drugs); id.
§ 597.049(a) (surrogate medical decisionmaker); Tex. Ins. Code art. 5.26-1, § 4 (showing that Department of
Insurance rate reduction would produce inadequate rates); id. art.
5.101, § 3(I) (insurance company rate adjustments); id. art. 5.131,
§ 4(b)(1)(determination that a particular rate reduction will force an
insurer to stop writing a line); Tex. Lab. Code § 103.004(a) (immunity from liability for
disclosure of false information by employer); Tex. Nat. Res. Code § 191.021(d) (designation of landmark status of
university building); Tex. Prob. Code § 42(b) (biological paternity); id.
§ 145(g) (prerequisite to independent estate administration); id.
§ 222(a)(2) (removal of personal representative for embezzlement); id.
§ 438(c)(evidence of irrevocable trust); id.
§ 684(a)(incapacity finding to support guardianship); id.
§ 761(b) (removal of personal representative for cruel treatment of ward);
id. § 777(b) (spending estate income or corpus for education or
maintenance of ward); id. § 855(g) (estate investment in ward’s
best interest); id. § 868(c)(2) (relieving a trustee of a duty if
in best interest of estate); Tex. Prop. Code § 27.004(l) (evidence to overcome determination
of third-party inspector compliance with warranties); id.
§ 27.0042(d) (reasonableness of buyout offer following construction
defect); id. § 29.003 (forced sale of real property); id.
§ 92.0563(b) (contract to waive landlord’s duty to repair under a written
lease); id. §§ 92.058(c), 94.160(c) (landlord’s proof of notice to
tenant of tenant illegalities); id. § 142.005(j)(2) (trust
modification in best interest of trust beneficiary); Tex. Tax Code § 151.159(b) (comptroller issuance of export
identification card); id. § 151.307(c) (evidence to overcome
presumption that property was not exported);
Tex. Water Code
§ 13.185(b) (utility rate relief must be in ratepayers’ best interest); Tex. Rev. Civ. Stat. art. 179(e), § 6.04(a) (prerequisite to issuing
race track license); id. art. 6243e.2(1), § 6(d)(rebuttal of
presumption of on-duty firefighter disability).





[52] E.g., Garza v. Maverick Mkt., Inc., 768
S.W.2d 273, 275-276 (Tex. 1989) (requiring clear and convincing proof of
paternity in wrongful death actions); Bogart v. Somer,
762 S.W.2d 577, 577 (Tex. 1988) (per curiam)
(requiring clear and convincing proof to refute the presumption of gift).





[53] 443 U.S. at 318-319 (emphasis in original).





[54] 96 S.W.3d at 266; In re C.H., 89 S.W.3d 17, 25
(Tex. 2002).





[55] Ellis County State Bank v. Keever,
888 S.W.2d 790, 793 (Tex. 1994); Meadows v. Green, 524 S.W.2d 509, 510
(Tex. 1975) (per curiam); accord, Omohundro v. Matthews, 341 S.W.2d 401, 411
(Tex. 1960) (AThe clear and convincing test is but another method of
measuring the weight of the credible evidence, and thus is also a fact
question.”); cf. Sanders v. Harder, 227 S.W.2d 206, 209 (Tex.
1950) (AIn practical effect [the requirement of clear and
convincing evidence] is but an admonition to the judge to exercise great
caution in weighing the evidence.”); see generally Bill Vance, The Clear and Convincing Evidence
Standard in Texas: A Critique, 48 Baylor
L. Rev. 391, 393-403
(1996).





[56] Keever, 888 S.W.2d
at 793 (malicious prosecution case); Meadows, 524 S.W.2d at 510
(malicious prosecution case); Omohundro, 341
S.W.2d at 411 (trespass to try title case).





[57] See Sanders, 227 S.W.2d at 209-210 (AIn certain types of cases courts have frequently
pointed out that the facts must be established by clear and convincing
evidence.  That rule, as said in Carl v. Settegast, Tex. Com. App., 237 S.W. 238 [1922], arose at a
time when such suits were cognizable only in courts of chancery where matters
of fact, as well as of law, were tried by the chancellor.  Verdicts of juries in those courts were
advisory only.  In our blended system the
field in which that rule operates is very narrow.  In practical effect it is but an admonition
to the judge to exercise great caution in weighing the evidence.  No doctrine is more firmly established than
that issues of fact are resolved from a preponderance of the evidence, and
special issues requiring a higher degree of proof than a preponderance of the
evidence may not be submitted to a jury. 
Carl v. Settegast, supra; McCormick and Ray on
Evidence, Section 30.  In ordinary civil
cases trial courts and Courts of Civil Appeals may set aside jury verdicts and
grant new trials when, in their opinion, those findings, though based upon some
evidence, are against the great weight and preponderance of the evidence, but
they may not render judgment contrary to such findings.  In those cases in which the ‘clear and
convincing’ rule is applicable if, in the opinion of the trial judge, the
evidence in support of the verdict does not meet the test of that rule, he may
set it aside and order a new trial; but he should not render judgment contrary
thereto.”); Keever, 888 S.W.2d at 793.





[58] Horrocks v. Texas
Dept. of Transp., 852 S.W.2d 498, 499 (Tex. 1993)
(per curiam) (“Ordinarily, an appellate court should render
judgment after sustaining a complaint as to the legal sufficiency of the
evidence.”); Holt Atherton Industries, Inc. v. Heine,
835 S.W.2d 80, 86 (Tex. 1992) (AAs a general matter, when we sustain a no evidence
point of error after a trial on the merits, we render judgment on that
point.”); see Calvert, supra note 19, at 362 (A‘No evidence’ points of error are inherently and
fundamentally points which call for reversal of a trial court’s judgment and
rendition of judgment for the appellant.”).





[59] Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965) (AIf the contention [that the evidence is factually
insufficient] is sustained, the finding under attack may be set aside and a new
trial ordered.”); see Calvert, supra note 19, at 365 (A‘Insufficient evidence’ points of error are points
which call for a reversal of the trial court’s judgment and remand of the case
for retrial.”).





[60] Choate v. San Antonio & A.P. Ry., 44 S.W. 69, 69 (Tex. 1898); see also Muhle
v. New York, T. & M. Ry., 25 S.W. 607 (Tex. 1894) (stating that “whether or not there was
evidence from which the jury might have [made a finding] is a question of law
which we are called upon to determine.”).





[61] Harte-Hanks
Communications, Inc. v. Connaughton, 491 U.S. 657, 685 (1989).





[62] E.g., Bentley v. Bunton,
94 S.W.2d 561, 596-597 (Tex.
2002).





[63] 96 S.W.3d at 266.





[64] 532 U.S. 424, 431 (2001).





[65] Post at ___.





[66] Post at ___.





[67] Post at ___.





[68] Post at ___.